This is an FELA action. The plaintiff, James R. Keen, was employed by the defendant, Seaboard System Railroad, Inc. The jury returned a verdict in favor of Keen for $500,000 and the trial court entered judgment on the verdict. The issues raised here relate only to the admission of certain evidence.
On May 21, 1984, Keen was a passenger in a company van delivering him and several other employees to their work stations in the Tilford Railroad Yard in Atlanta, Georgia. The van hit a large pothole in the road, causing Keen to bounce out of his seat and strike his head on the roof of the van. The blow caused injuries to Keen's neck and back. Keen was seen by a company doctor, who referred him to Dr. Walter Edwards, an orthopedic surgeon in Atlanta. Dr. Edwards treated Keen for approximately one month and then performed surgery in an attempt to correct the problem.
On October 10, 1984, Keen filed suit pursuant to the Federal Employers Liability Act, 45 U.S.C. § 51 etseq. (1970). About a week before trial, Keen was seen by Dr. Ralph Nichols, an orthopedic surgeon in Birmingham. Keen related what had happened to him and what symptoms he had, after which Dr. Nichols performed an examination of Keen. At trial a deposition taken of Dr. Nichols was read into evidence. Seaboard's attorney objected to the admission of Dr. Nichols's opinion of Keen's condition, claiming that, since Dr. Nichols had based his opinion, in part, on what Keen had told him, it was hearsay and inadmissible.
Seaboard also objected to the admission of the testimony of Dr. Fred Johnson, who testified as to Keen's lost future earnings. Seaboard argued that the method used by Dr. Johnson was based on before-tax earnings instead of after-tax earnings, as required by the FELA.
Seaboard claims that the testimony of Dr. Nichols should have been excluded because his opinion was based on information given to him by Keen and was thus, it says, inadmissible hearsay.
This Court held, in State Realty Co. v. Ligon,218 Ala. 541, 543-44, 119 So. 672, 674 (1929):
 "The law recognizes that, in the practice of medicine, a diagnosis of the ailment may include a personal examination of the patient by all the methods known to science, and also the history of the case, as given by the patient or other examining physicians.
 "This history may include a statement of present and past symptoms, the incidents connected with the beginning of the trouble, such as injury by accident, and the findings of other physicians, such as X-ray examination and blood tests. A professional opinion as to the nature, cause, and extent of the ailment, based upon all these matters in connection with and as part of the personal examination of the patient, is competent evidence. Necessarily the information coming to the physician may be largely hearsay. An exception [to the hearsay rule] is made because of the necessities of medical science, because the patient's statements are presumed to be made to aid a correct diagnosis and cure, and the professional reports of physicians and nurses with the same end in view.
 "If it otherwise appears that the statements of the patient were for other ends, or any item of information was not true, or in doubt, this goes to the probative force of the opinion of the physician. If it appears affirmatively that the sole ground on which the opinion was based was false, such opinion should be disregarded. *Page 1020 
If this appears without conflict or adverse inference, the opinion based thereon should be excluded. 1 Wigmore on Evidence, § 688; 3 Wigmore, § 1720."
Seaboard asserts that the general hearsay exception does not apply here because Keen did not see Dr. Nichols for treatment but only to prepare him to testify. Seaboard argues that under these circumstances the degree of reliability of Keen's statements to Dr. Nichols is not as high as it would have been if he had been seeking treatment. This argument for different rules for treating and consulting physicians is virtually precluded by the last paragraph quoted above fromLigon, which states that such questions go to the weight of the testimony unless it is incontrovertible that the facts on which the physician based his opinion were false.
Furthermore, such attempts to differentiate and exclude nontreating physicians' testimony have been criticized and largely abandoned. As expressed in a noted treatise:
 "§ 293. Statements of Bodily Feelings, Symptoms, and Condition: (c) Statements Made to Physicians Employed Only to Testify.
 "Many courts have drawn a sharp line between statements made to physicians consulted by the declarant for purposes of treatment and those made to physicians consulted solely with the anticipation that the physician will testify in court on the declarant's behalf. The limitations placed on the latter have differed among jurisdictions.
 "1. Numerous courts have held that descriptive statements of present pain or symptoms made to a physician consulted solely for purposes of preparing him to testify in the declarant's behalf are not admissible as substantive evidence of the pain or symptom under the general exception to the hearsay rule for statements of bodily condition. This restriction is based on the conclusion that where the declarant does not anticipate that his treatment's effectiveness will depend upon the accuracy of his statement, the underlying rationale for the exception does not exist. Moreover, if the declarant anticipates that enhancement of his symptoms will inure to his benefit in the subsequent litigation, there is also an affirmative motive to falsify or at least exaggerate. For these reasons, the general exception has been held inapplicable.
 "2. If a physician has been consulted for purposes of treatment, courts that would refuse to admit the physician's testimony of the 'history' related by the patient as evidence of the truth of the matters asserted may admit it for the limited purpose of 'explaining the basis of the physician's opinion'. A few courts, however, have held or indicated that physicians consulted solely for purposes of testimony may not recount what was told them, even for the purpose of explaining their opinions or conclusions.
 "3. A few courts, emphasizing the self-serving nature of representations made to physicians consulted for purposes of subsequent testimony, have adopted the extreme position that those physicians are confined to giving opinions based solely upon objective facts personally observed by them or upon hypothetical questions. Any opinion or conclusion based even in part upon 'subjective' facts, i.e., what the subject has said about the history of his condition or his symptoms, is therefore inadmissible. This, of course, is inconsistent with general medical practice which involves use of this information in forming opinions acted upon in the course of treatment and with the modern rule that medical opinions based in part upon factors not within the personal knowledge of the testifying physician are admissible.
 "The dubious propriety of these restrictions was probably at least partially responsible for the limited view taken by the courts as to what constitutes consultation solely for purposes of obtaining testimony from the physician consulted. The basic question was whether there was any significant treatment motive; if this existed, any additional motive of obtaining testimony was to be ignored. *Page 1021 
For example, a physician's testimony should not be governed by these restrictions despite the fact that he was consulted after the declarant retained an attorney or even at the attorney's recommendation. The fact that no treatment was actually given is not controlling, but subsequent reliance upon advice of a treatment nature given by the physician is strong evidence of a treatment motive for the initial consultation.
 "These restrictions have not stood the test of analysis or of the realities of practice. The nonsense of saying, particularly to juries, that patients' statements may be considered as explaining the physician's opinion but not as proof of the matter stated is now widely recognized. Also, contrived evidence has been avoided at too great cost in departure from the realities of medical practice. Accordingly, the trend is strongly in the direction of eliminating any differences in the admissibility of patients' statements to testifying as contrasted with treating physicians. The Federal and Revised Uniform Evidence Rules (1974) treat both alike.[12] The general reliance upon 'subjective' facts by the medical profession and the ability of its members to evaluate the accuracy of statements made to them is considered sufficient protection against contrived symptoms.
E. Cleary, McCormick on Evidence, pp. 841-42 (3d ed. 1984). (Footnotes omitted.)
Therefore, because these objections to the deposition of Dr. Nichols went to its weight and not its admissibility, the trial court did not err in allowing it into evidence.
Seaboard contends that the trial court erred in permitting certain testimony of damages that, it says, was inadmissible. The testimony that Seaboard claims was inadmissible was that of Dr. Fred Johnson, an associate professor of economics at the University of Alabama in Birmingham who has a Ph.D. in economics and a law degree. Dr. Johnson testified as to Keen's lost future wages. Seaboard argues that the figure calculated by Dr. Johnson, $341,888, did not take into consideration the effects of taxation. The United States Supreme Court has held that in determining the lost stream of income, the stream may be "approximated as a series of after-tax payments." Jones Laughlin Steel Corp. v.Pfeifer, 462 U.S. 523, 536, 103 S.Ct. 2541, 2550,76 L.Ed.2d 768 (1983). Keen asserts that Dr. Johnson did consider taxation in calculating the amount he testified to. During direct examination, Dr. Johnson testified:
 "A. I am saying, if you ask the tax consequences of this award, there are two. If he had worked and earned this income, he would have paid something called income tax on it. Like I said, it looks like it would be about 16 percent average taxes.
". . .
 "Now, because you are required before this amount to pay your income to invest it, then you are going to have interest on it. On that interest, you will pay taxes. So, you should add back to this amount of taxes paid only in interest itself [sic]. Now, there [is] a myriad combination of exemptions, deductions, tax brackets, loopholes, et cetera, available to despaired families. So, I don't know what the actual interest rate is going to be. I don't know what his maximum income tax is going to be. In my opinion, the more precise way of adding both of these is to assume that the income tax would be cancelled by taxing the interest, therefore, the three forty-one would be the after tax amount because you have got one that you add and one you subtract and soon they cancel each other out leaving you with the three forty-one.
". . . .
"Q. This figure would be an after tax figure?
 "A. Yes, sir, in my opinion, because of the two taxes that you must consider; one that you subtract and one that you add back."
It is clear from his testimony that Dr. Johnson did consider the effects of *Page 1022 
taxation in formulating his opinion as to the amount of lost future wages. Seaboard was given ample opportunity to cross-examine Dr. Johnson and could have presented evidence of its own as to lost wages to rebut his testimony. The trial court did not err in admitting Dr. Johnson's opinion testimony of lost future wages.
Seaboard's only arguments for reversal regard the admission of these items of evidence. Because the trial court did not commit reversible error in allowing this evidence, the judgment is affirmed.
AFFIRMED.
MADDOX, SHORES, BEATTY and ADAMS, JJ., concur.
[12] "Rule 803(4) provides a hearsay exception for statements 'made for purposes of diagnosis or
treatment.' (Emphasis supplied)"