BOLIN, Justice.
CSX Transportation, Inc. (“CSX”), appeals from a judgment entered on a jury verdict awarding Joel Don Miller damages of $450,000. We affirm.

Facts and Procedural History

Miller was employed with CSX and its predecessors from March 1967 until March 2003. During his 36-year career with CSX, Miller rode freight trains working as a conductor, a brakeman, and a flagman. Miller’s career with CSX can be divided into two phases. From 1967 until 1988 he primarily rode the Montgomery-to-Mobile route. In 1988, he relocated to Pensacola and primarily rode the Pensacola-to-Mobile route until he retired in 2003.
Miller rode the lead locomotive engine when working as a brakeman and the rear caboose when working as a conductor and flagman. Miller testified that in all three positions he was exposed to traumatic forces, including vibration, jerking, and jolting, on a daily basis while he was employed with CSX. The typical freight-train trip was described as “rough.”
Miller worked with CSX until 2001 with no complaints regarding his neck. However, in 2001, Miller began experiencing pain *439 and stiffness in his neck while riding on the locomotives. The pain did not result from a single precipitating event but occurred gradually over time. At the time Miller began experiencing the neck pain he was 58 years old and had been a heavy smoker all of his adult life. Miller testified that initially the neck pain would subside at the end of a run when he got off the locomotive and rested. However, he stated that the pain would return on his next run once he was again exposed to the traumatic forces on the train. Miller stated that the neck pain eventually became constant and began radiating down his right arm. Although CSX policy required him to complete a personal-injury report, Miller stated that he did not do so because he did not realize how serious his neck injury was.
Miller sought treatment for his symptoms and was initially seen by several physicians who ordered diagnostic tests and prescribed conservative treatment. Miller testified that he continued to work full-time without missing any work while being treated conservatively for the neck pain. He further stated that the conservative treatment was ineffective “while [he] was still riding trains.” When the conservative treatment failed to alleviate Miller’s neck symptoms he was referred to Dr. Bruce Raymon, a neurosurgeon.
Miller was first seen by Dr. Raymon on June 10, 2002, complaining of neck pain radiating into his right arm and numbness in his fingers. Dr. Raymon ordered an MRI, which revealed multilevel degenerative disk disease between the 3d through 6th cervical vertebrae. The MRI indicated that Miller had moderate to severe narrowing of the disk space at those disk levels, which he determined was consistent with Miller’s symptoms. Dr. Raymon diagnosed Miller with cervical radiculopathy, which he explained was a nerve-root compression with radiating pain into an extremity.
On July 24, 2002, Dr. Raymon performed surgery in order to decompress the nerve root and fuse the cervical vertebrae at the C4-5 and C5-6 levels. Dr. Raymon noted that the bone spurring in Miller’s cervical vertebrae was so severe that the vertebrae had to be recontoured in order to fixate the plates and screws used in the fusion.
Miller was next seen by Dr. Raymon for follow-up on September 9, 2002. At that time Miller was pain-free and was not experiencing numbness or tingling in his arm. Dr. Raymon stated that Miller had had an “excellent” response to the surgery. Miller requested that Dr. Raymon release him to return to work. Dr. Raymon released Miller to return to his full duties ■with CSX without restrictions.
Miller returned to work, and he again began experiencing symptoms in his neck once he was exposed to the traumatic conditions aboard the train. Miller returned to Dr. Raymon on October 7, 2002. Dr. Raymon noted at that time that Miller complained of increased neck pain and headaches. Dr. Raymon prescribed anti-inflammatory pain medication and informed Miller that if the pain did not improve he should consult a pain-management specialist. He did not place Miller on restricted work duty at that time. However, Dr. Raymon did discuss with Miller whether his working conditions could be changed and, if not, whether he could continue to work under the conditions of his job and tolerate the pain. Miller stated that at the time he chose to “keep working and tolerate the pain.”
Miller returned to work and performed the full duties of his job until March 2003. Miller eventually concluded that his neck could no longer “stand getting up on another train” and decided to retire from *440 CSX. Miller was eligible for “full retirement” based on his age and his years of service. Miller took the “full retirement” on March 25, 2003, at age 60 and in doing so “voluntarily relinquished” any right to return to employment with CSX. Miller stated that because he was already eligible to retire based on age and years of service he did not “bother” with disability retirement. Although Miller retired based on his age and years of service, he stated that he had intended and needed to continue working until the age of 65 but was unable to do so because of the pain in his neck.
Miller continued to receive treatment for his neck condition following his retirement in March 2003. He underwent additional diagnostic tests, received pain-management injections, and took narcotic pain medications, including Lortab and methadone. In May 2004, Miller was informed that there was nothing that could be done surgically to relieve his pain. His prognosis at that time was “somewhat guarded given the advanced multi-level [disk] disease.” In March 2006, Miller received a fluoroscopic injection, which provided him with greater relief from his neck symptoms. He testified at trial that he continues to have light to moderate pain in his neck with exertion during activities but “nothing near what [he] was experiencing.” Miller stated that he controls his pain with over-the-counter medication and that he had not received any medical treatment, other than pain management, for his neck since March 2003.
On cross-examination, Miller testified that no physician told him that he could not work because of his condition and that he made the decision to retire based on the pain he was experiencing in his neck. Miller testified that because of his neck condition he has not looked for other employment since retiring and that he has no intention of seeking other employment. Miller stated that he was the most senior man in Pensacola when he decided to retire and that he could have returned to work as a switchman if he had wanted, but he did not do so because he did not know “what the effect [of] switching would have on [his] neck ” Larry Allerellie, a retired CSX official who had formerly served as system general mechanical inspector in CSX’s mechanical department, stated that Miller’s neck condition made him a safety hazard and unsuitable for the position of switchman.
Miller has identified four conditions associated with riding freight trains that he contends contributed to the traumatic forces to which he was exposed during his career at CSX. First, he presented evidence indicating that a number of areas along the CSX routes were particularly rough because of the track conditions. These areas were described in testimony as “continuously rough,” “fairly rough riding,” and a “pretty good jerk.” One particular section of track would cause the locomotive to shake from side to side so violently that the CSX employees on board the train had to “hold on” to keep from being “thrown out” of their seat. On cross-examination Miller stated that he never requested that the engineer slow the train down in anticipation of the “rough spots” and that he never reported any of the “rough spots” to CSX. However, O.D. King, an engineer employed by CSX who had worked with Miller, testified that the trains were routinely issued “slow orders” to reduce the train’s speed when traveling through rough areas of track. King also stated that certain areas of track were “constant” problems that were never satisfactorily corrected after being reported to CSX.
Second, Miller claims that he was exposed to “slack action” while employed by CSX. “Slack action” is the loose-motion *441 force generated by a moving freight train when one section of the train is traveling at a greater speed than another section of the train. The “slack” is said to be “going out” when the locomotives are traveling faster than the rest of the train and “coming in” when the rest of the train is traveling faster than the locomotive. Those employees riding in the locomotive would be “thrown” forward and backward by the “whipping” action created by the “slack” forces moving in or out. The “slack action” hits the locomotive hard and will cause the employees in the locomotive to be “knocked” from their seats. The intensity of the “slack action” varies depending on the weight and type of train. Miller was exposed to “slack action” regularly while riding on the freight trains.
Third, Miller rode cabooses when working as a conductor and flagman from 1967 until the mid 1980s when CSX phased them out. A common condition associated with the cabooses was known as “dead” draw-head. A draw-head is the welded coupling located on the front of the caboose that connects the caboose to the railroad car in front of it. The draw-head was referred to as being “dead” because it was solid, with no “give to it at all” so that when “slack action” ran in “it felt like you ran into a solid wall,” and when “slack action” ran out “it felt like you were rear-ended in an automobile accident.” The employees riding in the cabooses experienced the traumatic impacts produced by the “slack action” on a regular basis and felt “beat up” at the end of a trip. CSX did install a cushioned draw-head shortly before phasing out the caboose in the mid 1980s, which helped to alleviate the traumatic impacts caused by the “slack action.”
Finally, Miller contends that the locomotive seats contributed to the traumatic forces he was exposed to during his employment with CSX. CSX used two types of locomotive seats during Miller’s career: (1) the “toadstool” or “roundbottom” seat and (2) the “Jagger” seat. The “toadstool” seat was a low-back seat that could be side-mounted to the wall of the locomotive on a track that permitted the seat to be adjusted forward and backward. Some “toadstool” seats were pedestal mounted to the floor of the locomotive. Due to the height of its seat back, the “toadstool” seat provided little support for the employee’s head and neck area. Additionally, the side-mounted “toadstool” seats were often unstable and not secure because of wear on the mounting-track system and the locomotive wall caused by rust and the track system’s being “wollered out,” which caused these seats to “wobble” and “shake.” The side-mounted “toadstool” seats would sag as a result of wear of the track system and missing height-adjustment pins, which also contributed to the instability of the seats. These seats regularly had to be “propped” up using wood, bricks, or flagsticks in order to correct the sag. Miller testified that he encountered a seat that sagged to the point that it had to be “propped” up approximately three or four times per year. However, he stated that the “loose” seats that vibrated with the movements of the locomotive were “very common.”
In 1972, the Federal Railroad Administration (“FRA”) studied the effect of locomotive-cab vibrations on railroad employees and recommended the phasing out of “toadstool” seats. In January 1980, the Association of American Railroads (“AAR”), a trade organization, completed a study entitled “Locomotive Cab Seat Evaluation,” which indicated that 22% of railroad employees complained of neck pain following a typical train run. The AAR recommended a better designed seat and improved maintenance on the existing seats. Despite the recommendations of *442 the FRA and the AAR, CSX did not introduce a new seat until the early 1990s.
Terry Wells, CSX’s manager of labor relations, testified that he was a former locomotive engineer and that he had served as an official with the Brotherhood of Locomotive Engineers (“BLE”). Wells stated that a “cab committee” was created as part of the BLE’s 1986 national labor agreement with CSX. The purpose of the “cab committee” was to give labor the opportunity to provide input relating to the design, safety, and comfort of the locomotive cabs, including locomotive seats. Wells was a member of CSX’s first cab committee as a representative of the BLE.
In 1986, the cab committee sought to upgrade the locomotive seats by procuring an ergonomically designed locomotive chair that provided maximum comfort and safety for the employee. The cab committee evaluated several types of seats from various vendors. Specifically, the cab committee considered the following specifications to be essential to the design of the seat: a contoured seat bottom and back; good lumbar support; an armrest; heavy duty ventilated vinyl fabric for the seat; safe and simple adjustment; and oil and mildew resistance. The cab committee did not specifically consider motion, vibration, and protecting the employee’s neck region as issues when considering the specifications for the new seat design. The cab committee eventually selected two seats for field testing: the Jagger seat and the Nelson seat. Prototype seats were built to the cab committee’s specifications and then placed on CSX locomotives for testing by train crews. The Jagger seat was designed with a short back to provide the engineers with greater rear visibility. Wells testified that he was unaware of any complaints being made regarding the design of the Jagger seat with a short back.
A survey of the train crews was conducted to determine how each seat performed. Following the survey of the train crews, the Jagger seat was ultimately selected by a majority vote of the BLE. Wells explained that the selection of the Jagger seat was a “collaborative effort between the railroad and the unions” and was done with the safety of the employee in mind. CSX began outfitting its locomotives with the Jagger seat in the early 1990s.
Many of the Jagger seats were side-mounted on the wall of the locomotive similar to the “toadstool” seats. The employees encountered the same stability issues with the side-mounted Jagger seats as they had with the side-mounted “toadstool” seats when the mounting-track system or the locomotive wall began to wear. Miller described the side-mounted Jagger seats as “unstable” and “shaky.” On cross-examination, Miller testified that before each run he inspected his seat and that if he felt the seat was defective or unsafe he was required to report it. Although Miller stated that he never specifically complained to CSX management regarding the condition of the seats, he stated that numerous complaints were made and that sometimes the seats were replaced.
Allerellie testified that federal regulations required locomotive cab seats to be securely mounted and braced. He stated that the train crews have an obligation to report unsafe equipment or conditions. Allerellie testified that engineers complained of defective seats from time to time and that when an engineer reported a defective seat a member of Allerellie’s department would inspect the seat and either repair or replace it. If the seat could not be repaired or replaced immediately, the locomotive would be pulled off the line and sent to the garage for repair. Allerellie *443 stated that a locomotive with a defective seat would not be allowed to run.
Dr. Raymon testified that several factors contribute to degenerative disk disease such as Miller’s, including age, smoking, genetics, and repetitive trauma. Dr. Raymon testified that Miller’s working conditions contributed to his degenerative disk disease and specifically stated that Miller’s working conditions aboard the freight trains “aggravated or precipitated his symptoms” and “contributed to his clinical presentation and symptoms.” On cross-examination by CSX, Dr. Raymon testified that Miller’s age and smoking history contributed to his degenerative disk disease. However, Dr. Raymon also further stated that even considering Miller’s age and his history of smoking, it is “not common” to find a cervical spine with the degree of degenerative disk disease Miller had.
Dr. Ralph Kelley, an occupational-medicine specialist and a witness for Miller, testified that the relationship between shock forces and cervical degeneration is widely recognized. Dr. Kelley opined that loose locomotive seats cause more movement than securely mounted seats, which tends to amplify the shock forces aboard a locomotive. Dr. Kelley stated that railroad personnel who work aboard trains and who are exposed to vibrating forces are more likely to suffer neck disorders and to require neck surgery than people not exposed to such forces aboard trains. Dr. Kelley concluded that Miller’s long work history with CSX and his working conditions aboard the trains were significant factors in his degenerative disk disease. Dr. Kelley also testified that Miller’s age and his history of smoking were less significant factors that contributed to his degenerative condition.
Dr. Stephen Dawkins, an occupational-medicine specialist and a witness for CSX, testified that Miller’s neck symptoms were the result of his age and his history of smoking and “nothing more.” Dr. Daw-kins stated that Miller’s working conditions did not contribute to Miller’s symptoms, explaining that the onset of Miller’s symptoms were consistent with his age and that, had Miller’s working conditions contributed to his symptoms, he would have experienced his symptoms earlier than he did.
CSX presented testimony from Robert Larson, a mechanical engineer, who conducted vibration testing on the locomotive runs from Montgomery to Mobile and from Pensacola to Mobile. Larson measured the vibration levels of the side-mounted seats to determine how much vibrating energy was “going into the person” sitting on the seats. Larson also measured the vibration levels of the locomotive walls to determine the levels of vibration “coming in” through a person’s feet when the person is standing. Larson testified that the results of his vibration testing fell “far below the health caution zone,” meaning there was little risk of injury as a result of whole-body vibration on either the Montgomery-to-Mobile or the Pensacola-to-Mobile route. Larson further testified that the transient “shocks and spikes” of the vibrating forces were not at a level that would cause injury. Larson concluded that, based on his testing and comparison to the relevant standards, Miller’s work environment aboard the locomotives was reasonably safe.
CSX also presented testimony from Dr. John Trimble, a biomechanical-engineering expert, who testified that both types of seats used by CSX were reasonably safe from a biomechanical standpoint. Miller presented testimony from Dr. Tyler Kress, also a biomechanical-engineering expert, who testified that the seats used by CSX were not appropriate for the shock-filled *444 conditions aboard the locomotives. He further stated that the shock-filled conditions were further exasperated when cab seats are not securely mounted and braced.
Miller sued CSX on February 10, 2003, asserting a negligence claim under the Federal Employer’s Liability Act, 45 U.S.C. § 51 et seq. (“FELA”), and alleging that during the course of his employment with CSX he was exposed to “excessive vibration and strain as a consequence of rough track and loose, defective locomotive seats” resulting in permanent injuries to his neck and spine. Miller alleged that his injuries were caused by CSX’s negligence or by reason of a defect or insufficiency in CSX’s track, roadbeds, equipment, safety practices, maintenance practices, and inspection practices as a result of negligence by CSX. Miller further alleged that CSX was strictly hable under the FELA for violating the Locomotive Inspection Act (formerly the Boiler Inspection Act), 49 U.S.C. § 20701 (“LIA”), by failing to provide a locomotive with parts and appurtenances in good and safe working order.[1] Miller also alleged a violation of 49 C.F.R. § 213.101 et seq., asserting that CSX had failed to provide adequate track support.
CSX answered the complaint by denying the allegations in the complaint and asserting certain affirmative defenses, including the failure to mitigate damages. Thereafter, Miller amended his complaint on three occasions to assert additional facts; to allege an additional violation of the LIA by asserting that his injuries were caused by CSX’s violation of 49 C.F.R. § 229.119 for failing to provide cab seats that were securely mounted and braced; and to allege that his injuries were caused by CSX’s violation of 49 C.F.R. § 229.63 in that CSX allowed the locomotives to run with excessive lateral motion. CSX answered each amended complaint denying the allegations of the complaint and asserting certain defenses.
The case proceeded to trial on March 17, 2008. At the close of Miller’s ease, CSX moved for a preverdict judgment as a matter of law (“JML”) as to the claims asserted by Miller. The trial court granted the preverdict JML as to Miller’s claims alleging a violation of 49 C.F.R. § 213.101 and 49 C.F.R. § 229.63 and denied it as to the claims asserting negligence under the FELA and a violation of the LIA. CSX renewed at the close of all the evidence its motion for a JML; the trial court denied CSX’s renewed motion for a preverdict JML.
The case was submitted to the jury on Miller’s FELA claims alleging negligence and his claim alleging a violation of the LIA for failing to provide a locomotive with parts and appurtenances in good and safe working order, which included the alleged violation of the regulation requiring securely mounted and braced cab seats. The jury returned a general verdict *445 in favor of Miller and against CSX and assessed Miller’s damages at $450,000. The trial court, on March 27, 2008, entered a judgment in favor of Miller based on the jury’s verdict.
On April 24, 2008, CSX moved the trial court for a postverdict JML or, in the alternative, for a new trial; to alter, amend, or vacate the judgment; or for a remittitur. On June 20, 2008, the trial court entered an order denying CSX’s postjudgment motions.

Discussion

I. Apportionment of Damages

CSX contends that a FELA defendant is entitled to apportion a plaintiffs damages among three sources: (1) the defendant’s own negligence; (2) the plaintiffs contributory negligence; and (3) other causes. Although a FELA defendant cannot escape liability because a preexisting condition made a plaintiff more susceptible to a work-related injury, Sauer v. Burlington Northern R.R., 106 F.3d 1490, 1495 (10th Cir.1996), the FELA does provide for the apportionment of damages between an employer’s negligence and an employee’s contributory negligence. 45 U.S.C. §§ 51 & 53. The FELA does not allow apportionment among jointly liable tortfeasors. Norfolk & Western Ry. v. Ayers, 538 U.S. 135, 159-66, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003) (noting that if a third-party tortfeasor is at fault for contributing to an employee’s damage, the employee is entitled to a full recovery from the employer and the employer may then seek contribution from the third-party tortfeasor). By contrast, it appears well, settled that the FELA contemplates apportionment among an employer’s negligence and other non-work-related causes.[2] See Lancaster v. Norfolk & Western Ry., 773 F.2d 807 (7th Cir.1985)(recognizing that an apportionment instruction was appropriate where the probability existed that plaintiff would have been injured by a latent condition from which the employee suffered, notwithstanding the defendant’s negligence); Stevens v. Bangor & Aroostook R.R., 97 F.3d 594 (1st Cir.1996) (reinforcing the principle that when a defendant’s negligence merely aggravates a plaintiffs preexisting condition, the defendant is only liable for the increased injury caused by its negligence, not for the pain and impairment the plaintiff would have suffered even if the accident had never occurred); Sauer, supra (affirming jury instruction directing the jury to reduce damages by the likelihood that the employee would eventually have suffered the injury due to a preexisting condition even had the accident not occurred); Varhol v. National R.R. Passenger Corp., 909 F.2d 1557 (7th Cir.1990); and Evans v. United *446 Arab Shipping Co., 790 F.Supp. 516 (D.N.J.1992) (holding that where an employer’s negligence aggravated a preexisting condition the employer must compensate employee only for the aggravation of the preexisting condition and not the preexisting condition itself). The extent to which the injury is attributable to other causes need not be proven to a mathematical certainty; the evidence need only be sufficient to permit a rough apportionment. Sauer, 106 F.3d at 1494. “Apportionment can be proved without expert testimony stating the percentage of injury attributable to the different causes.” Sauer, 106 F.3d at 1494. However, where the fact-finder is unable to separate those injuries caused or exacerbated by the workplace accident from those injuries resulting from preexisting conditions, the defendant is liable for all injuries. Stevens, 97 F.3d at 603.
CSX submitted proposed jury charges instructing the jury that it must not award damages to Miller for injuries that he sustained as the result of other causes, specifically his age and his history of smoking, and that it must award him damages only for injuries that occurred as a direct result of CSX’s negligence. CSX also submitted special interrogatories that would have allowed the jury to assign appropriate percentages of fault based on CSX’s violation of the LIA; CSX’s negligence; Miller’s own contributory negligence; and Miller’s age and his history of smoking. CSX contends that the trial court erroneously rejected its jury charges relating to the issue of apportionment and elected to use a basic jury-verdict form with no special interrogatories or instructions. CSX contends that the trial court’s categorical rejection of its proposed jury charges and special interrogatories constitutes reversible error entitling it to a new trial.

A. Standards of Review

The decision whether to grant or to deny a motion for a new trial rests within the sound discretion of the trial court. Jordan ex rel. Jordan v. Calloway, 7 So.3d 310, 313 (Ala.2008).[3] The denial of a motion for a new trial strengthens the presumption of correctness afforded a jury verdict. Id. In addition, this Court has stated the standard for reviewing a trial court’s refusal to give a particular charge to the jury is as follows:
“ ‘ “In a jury case, a party is entitled to have its case tried to a jury that is given the appropriate standard by which to reach its decision, and a wrongful refusal of a requested jury charge constitutes a ground for a new trial. See, C.I.T. Financial Services, Inc. v. Bowler, 537 So.2d 4 (Ala.1988). An incorrect, misleading, erroneous, or prejudicial charge may form the basis for granting a new trial. See, Nunn v. Whitworth, 545 So.2d 766 (Ala.1989). However, the refusal of a requested, written instruction, although a correct statement of the law, is not cause for reversal on appeal if it appears that the same rule of law was substantially and fairly given to the jury in the trial court’s oral charge. See, Rule 51, Ala. R. Civ. P. When examining a charge asserted to be erroneous, this Court looks to the entirety of the charge to see if there is reversible error. See, Grayco Resources, Inc. v. Poole, 500 So.2d 1030 (Ala.1986).” ’
“Cackowski v. Wal-Mart Stores, Inc., 767 So.2d 319, 327 (Ala.2000) (quoting Shoals Ford, Inc. v. Clardy, 588 So.2d *447 879, 883 (Ala.1991)). Additionally, ‘[a]ny error or defect which does not affect the substantial rights of the parties may be disregarded.’ Bishop v. State Auto. Mut. Ins. Co., 600 So.2d 262, 265 (Ala.Civ.App.1991) (citing Rule 61, Ala. R. Civ. P.). As a result, the jury instruction must be erroneous as well as prejudicial, and this Court cannot presume prejudice. Brabner v. Canton, 611 So.2d 1016, 1018 (Ala.1992); Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165, 167 (Ala.1991). The appellant has the burden of demonstrating that an erroneous jury instruction was prejudicial. See Ryan, 589 So.2d at 167 (citing Dinmark v. Farrier, 510 So.2d 819 (Ala.1987)).”
Southeast Envtl. Infrastructures, L.L.C. v. Rivers, 12 So.3d 32, 43-44 (Ala.2008).

B. CSX’s Proposed Jury Charges

CSX submitted the following proposed jury charges relating to the issue of apportionment:
“DEFENDANT’S REQUESTED JURY INSTRUCTION NO. 38. Defendant is entitled to apportion damages between the various causes of a Plaintiffs injury, including pre-existing conditions. Based on the evidence in this case, you should determine what percentage of Plaintiffs present condition was caused by the injuries sustained as a result of his age, smoking, and genetics, if any, what percentage was caused by the negligence of the Defendant, if any, and what percentage was caused by Plaintiffs own negligence, if any.”
“DEFENDANT’S REQUESTED JURY INSTRUCTION NO. 39. You must not award damages to Plaintiff for injuries that he sustained as a result of other causes including, but not limited to, Plaintiffs age, smoking, genetics, and other non-railroad activities. You must only award the amount of damages that occurred as a direct result of Defendant’s negligence.
“If you find that Plaintiffs injury was due in part to his age, smoking, genetics, or other non-railroad activities, you should determine the portion or percentage of Plaintiffs injury that was so caused.”
“DEFENDANT’S REQUESTED JURY INSTRUCTION NO. 40. If you find that the Plaintiffs age, smoking, genetics, or other non-railroad activities may have caused him harm, you should not consider any loss caused by such age, smoking, genetics, or other non-railroad activities nor should you award the Plaintiff any damages that were caused by the Plaintiffs age, smoking, genetics and non-railroad activities.
[[Image here]]
“DEFENDANT’S REQUESTED JURY INSTRUCTION NO. 41. If you find for the Plaintiff, you may award him monetary compensation only for the extent of the injury caused by the Defendant in the course of the Plaintiffs occupational activities while he was employed by the Defendant. If the Plaintiff has a pre-existing injury or condition, then you should compensate him only for the aggravation of the preexisting injury or condition and not the entire injury itself. If you find that there has been an aggravation of a preexisting condition you should, if possible, decide what portion of the Plaintiffs present condition resulted from the aggravation and only award him damages for that percentage of his injury in your verdict.”
The trial court refused to give the jury charges proposed by CSX; instead, the *448 trial court charged the jury on the issue of apportionment as follows:
“The preexistence of the condition in the Plaintiff which serves only to make him more or less susceptible to the infliction of the injury in question, does not affect the damages to which he is entitled.
“So if you find for the Plaintiff, you may award him monetary compensation only for the extent of the injury proximately caused by the Defendant’s negligence or violation of the Locomotive Inspection Act or safety regulation.
“If the Plaintiff has a preexisting injury or condition, then you should compensate him only for the aggravation of the preexisting injury or condition and not the entire injury in itself.
“If you find that there has been an aggravation of a preexisting condition, you should, if possible, decide what portions of the Plaintiffs present condition resulted from the aggravation and only award him damages for that percentage of his injury in your verdict.
“If, however, you cannot separate the injuries caused or exacerbated by the accident from those resulting from a preexisting condition, then the Defendant is liable for all of such injuries.”
The proposed charges submitted by CSX were not a correct statement of the law on the issue of apportionment. Although the proposed charges correctly instructed the jury that when a defendant’s negligence merely aggravates or exacerbates a plaintiffs preexisting condition, the defendant is liable only for the aggravation or exacerbation of the preexisting condition proximately caused by the defendant’s negligence and not the entire injury itself, the proposed charges failed to instruct the jury that if it were unable to separate the injury caused or exacerbated by the defendant’s negligence from the injury resulting solely from a preexisting condition then it should compensate the employee for the whole injury. Stevens, 97 F.3d at 603. The charge given to the jury by the trial court included an almost verbatim statement of CSX’s proposed charge no. 41, which informed the jury that a defendant is liable only for the aggravation or exacerbation of a preexisting condition proximately caused by the defendant’s negligence and not the entire injury itself. The trial court’s charge to the jury also included the proposition of law set forth in Stevens, supra, that if the jury was unable to separate the plaintiffs injury caused or exacerbated by the defendant’s negligence from the injury resulting from preexisting conditions then the employee should be compensated for the whole injury. The charge given the jury by the trial court was a correct statement of the applicable law.
In addition to being a correct statement of the applicable law, the charge given the jury by the trial court was supported by the evidence in this case. Miller was diagnosed with degenerative disk and spine disease. Dr. Raymon and Dr. Kelley testified that repetitive trauma and vibrating forces, such as those Miller was exposed to riding freight trains, can contribute to degenerative disk and spine disease. Both Dr. Raymon and Dr. Kelley opined that the working conditions aboard the freight trains contributed to Miller’s degenerative disk disease, and Dr. Raymon specifically stated that Miller’s working conditions aboard the trains “aggravated or precipitated his symptoms” and “contributed to his clinical presentation and symptoms.”
Dr. Dawkins, on the other hand, attributed Miller’s degenerative disk disease to other causes. Dr. Dawkins opined that Miller’s symptoms were the result of his age and his history of smoking and “nothing more,” and that Miller’s working condi *449 tions aboard the freight trains did not contribute to Miller’s symptoms.
The split in the evidence as to causation provided a basis for the jury’s inability to apportion liability for Miller’s injury between CSX’s alleged negligence in failing to provide a safe working environment and Miller’s age and his history of smoking. Accordingly, we find no error in the trial court’s refusal to give CSX’s proposed jury charges on apportionment and further find no error with regard to the apportionment instruction actually given to the jury by the trial court.

C. Special-Verdict Form

CSX also argues that the trial court erred in refusing to submit its special-verdict form to the jury. CSX contends that this was a complicated trial that lasted nine days, with multiple claims, extensive expert testimony, and multiple causes of injury and that a special-verdict form was necessary to adequately address the issues presented. The FELA does not require the use of a special-verdict form. Bissett v. Burlington Northern R.R., 969 F.2d 727 (8th Cir.1992). Whether to direct the jury to return a general verdict or special verdicts is within the sound discretion of the trial court. Bissett, supra; Committee Comments on 1973 Adoption of Rule 49, Ala. R. Civ. P.; see also Dardess v. SouthTrust Bank of Quad Cities, 555 So.2d 746 (Ala.1989).
The special-verdict form submitted by CSX would have permitted the jury to make individual findings on both the FELA negligence claim and the FELA strict-liability claim, which alleged a violation of the LIA. The special-verdict form would have also permitted the jury to apportion percentages of fault between CSX’s violation of the LIA, CSX’s negligence, Miller’s contributory negligence, and other non-work-related matters such as age and/or history of smoking. Specifically, question 8 of the special-verdict form asked the jury the following:
“What percentage of Plaintiffs condition was caused by the following:
“a. Percentage due to Defendant’s violation of Locomotive Inspection Act pertaining to securely mounted and braced cab seats:
_ %
“b. Percentage due to Defendant’s negligence:
_ %
“c. Percentage due to Plaintiffs negligence:
_ %
“d. Percentage due to non-work related matters, including age and/or smoking:
_ %”
Question 9 of the special-verdict form asked the jury the following question:
“What total amount do you find, without any reduction for any negligence that you may find on Plaintiffs part or due to non-work related matters including age and/or smoking, will fairly and adequately compensate Plaintiff for his alleged neck injury?”
In Norfolk Southern Ry. v. Bradley, 772 So.2d 1147 (Ala.2000), this Court considered a similar issue. In Bradley, the plaintiff sued Norfolk under the FELA seeking to recover damages for injuries he sustained while working as a yard engineer. Norfolk submitted a special-verdict form that would have permitted the jury to apportion damages between the plaintiffs on-the-job accident and certain preexisting non-work-related illnesses that independently would have caused the plaintiff to miss work. Norfolk’s special-verdict form included, among others, the following questions:
*450 “Question 6 asks: ‘What amount do you find, without any reduction for any negligence which you may find on the Plaintiffs part, will fairly and adequately compensate the Plaintiff for the injury he received?’ Question 7 asks: ‘What percentage of the damages determined in Question 6 above is attributable to a pre-existing condition or to the Plaintiffs previous or subsequent accidents?’ ”
Bradley, 772 So.2d at 1152.
The trial court refused to submit Norfolk’s special-verdict form to the jury. Norfolk argued on appeal that a special-verdict form was required because the case was “complex.” In affirming the trial court’s refusal to submit the special-verdict form to the jury, this Court stated:
“The trial court properly refused Norfolk Southern’s proposed verdict form, because it was confusing and misleading. Question 6 specifically asks the jury to assess the amount of damages that would fairly and adequately compensate Bradley for his injury. Then Question 7 asks the jury to assess a percentage of the amount of damages from Question 6 that are attributable to ‘a pre-existing condition or to the Plaintiffs previous or subsequent accidents.’ The questions are inconsistent and present an incorrect basis for determining damages. The questions would have asked the jury to determine the amount of damages Bradley was entitled to based on the on-the-job accident and then to assign a percentage of those damages as being attributable to another accident or medical condition.
“In addition, the trial court specifically charged the jury that Bradley could not recover for any other accident or illness that was not directly the result of the accident in question....
[[Image here]]
“The juiy was properly instructed that it could compensate Bradley only for injuries resulting from the train accident. The trial court did not err in refusing Norfolk Southern’s proposed verdict form.”
Bradley, 772 So.2d at 1152.
Like questions 6 and 7 in Bradley, questions 8 and 9 in this case ask the jury to assign a percentage of Miller’s damages as attributable to non-work-related issues such as age and history of smoking and then asks the jury to compensate Miller for the amount of damages he is entitled for his neck injury without any reduction for non-work-related matters such as his age and history of smoking. We further note that like the jury in Bradley, the jury in this case was properly instructed by the trial court that Miller could not be compensated for any injury not proximately caused by CSX’s negligence. Accordingly, we cannot say that the trial court exceeded its discretion in refusing to submit CSX’s special-verdict form to the jury.

II. Lost Wages

CSX argues that the trial court erred in denying its motion for a preverdict JML as to Miller’s claim under the FELA for lost wages.[4] CSX argued that Miller voluntarily retired from employment with CSX in March 2003 and, therefore, should have been precluded from recovering any lost wages after that date. The standard of review for a ruling on a motion for a JML is as follows:
“When reviewing a ruling on a motion for a JML, this Court uses the same *451 standard the trial court used initially in deciding whether to grant or deny the motion for a JML. Palm Harbor Homes, Inc. v. Crawford, 689 So.2d 3 (Ala.1997). Regarding questions of fact, the ultimate question is whether the nonmovant has presented sufficient evidence to allow the case to be submitted to the jury for a factual resolution. Carter v. Henderson, 598 So.2d 1850 (Ala.1992). The nonmovant must have presented substantial evidence in order to withstand a motion for a JML. See § 12-21-12, Ala.Code 1975; West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989). A reviewing court must determine whether the party who bears the burden of proof has produced substantial evidence creating a factual dispute requiring resolution by the jury. Carter, 598 So.2d at 1353. In reviewing a ruling on a motion for a JML, this Court views the evidence in the light most favorable to the nonmovant and entertains such reasonable inferences as the jury would have been free to draw. Id. Regarding a question of law, however, this Court indulges no presumption of correctness as to the trial court’s ruling. Ricwil, Inc. v. S.L. Pappas & Co., 599 So.2d 1126 (Ala.1992).”
Waddell & Reed, Inc. v. United Investors Life Ins. Co., 875 So.2d 1143, 1152 (Ala.2003).
The Railroad Retirement Act (“RRA”), 45 U.S.C § 231a(a)(l), provides:
“(1) The following-described individuals, if they shall have ... filed application for annuities, shall, subject to the conditions set forth in subsections (e), (f), and (h) of this section, be entitled to annuities in the amounts provided under section 231b of this title—
“(i) individuals who have attained retirement age (as defined in section 216(1) of the Social Security Act [42 U.S.C. § 416(1) ]);
“(ii) individuals who have attained the age of sixty and have completed thirty years of service;
“(iii) individuals who have attained the age of sixty-two and have completed less than thirty years of service, but the annuity of such individuals shall be reduced by 1/180 for each of the first 36 months that he or she is under retirement age (as defined in section 216(1) of the Social Security Act when the annuity begins to accrue and by 1/240 for each additional month that he or she is under retirement age (as defined in section 216(1) of the Social Security Act [42 U.S.C. § 416(1) ]) when the annuity begins to accrue;
“(iv) individuals who have a current connection with the railroad industry, whose permanent physical or mental condition is such as to be disabling for work in their regular occupation, and who (A) have completed twenty years of service or (B) have attained the age of sixty; and
“(v) individuals whose permanent physical or mental condition is such that they are unable to engage in any regular employment.”
The RRA imposes two conditions on the receipt of retirement annuity benefits:
“(1) No individual shall be entitled to an annuity under subsection (a)(1) of this section until he shall have ceased to render compensated service to an employer as defined in section 231(a) of this title.
“(2) An annuity under subsection (a)(1) of this section shall be paid only if the applicant shall have relinquished such *452 rights as he may have to return to the service of an employer-”
45 U.S.C. § 231a(e)(l) and (2).
It is undisputed that Miller applied for and received retirement benefits pursuant to § 281a(a)(l)(ii), based on his age and his years of service with CSX, and that he voluntarily relinquished any right to return to his employment with CSX pursuant to § 231a(e)(l) and (2). Miller specifically stated that he did not take disability retirement. Therefore, CSX contends, Miller should have been precluded from recovering any damages for lost wages after March 2003, because he chose to retire voluntarily pursuant to § 231a(a)(l)(ii) and to relinquish his rights to future compensation from CSX.
The argument presented by CSX has previously been rejected. In an unpublished opinion in Broadus v. CSX Transportation, Inc., (No. 08-1201, July 8, 2009) (E.D.La.2009) (not reported in F.Supp.2d), the plaintiff, a railroad engineer for CSX, sustained a back injury on April 25, 2006, when he slipped and fell on mainline ballast in CSX’s Sibert Yard in Mobile, Alabama.[5] The plaintiff sued CSX seeking to recover, among other things, lost wages and alleging that CSX had breached its duties under the FELA by putting mainline ballast in the Sibert Yard rather than yard ballast, which he alleged provided a safer walking surface. On February 16, 2007, the plaintiff voluntarily retired from CSX pursuant to § 231a(a)(l)(ii) based on his age and years of service.
CSX moved the district court to preclude the plaintiff from recovering future lost wages because, it said, the plaintiffs decision to voluntarily retire and to receive benefits pursuant to the RRA required him to cease compensated service and to relinquish the right to return to the service of an employer; therefore, it contended, he could not recover lost future wages for work he could no longer perform under the terms of the RRA. In denying CSX’s motion, the district court stated:
“The RRA does not, either explicitly or by cross-reference, preclude a claim for future lost wages under the FELA. The RRA ‘is substantially a Social Security Act for employees of common carriers.’ Eichel [v. New York Central R.R., 375 U.S. 253, 254 (1963)]. It establishes conditions for retirement and disability. It does not deal with employer tort liability. It is up to the Railroad Retirement Board (RRB) to determine eligibility and continuing eligibility for retirement benefits. See 45 U.S.C. § 231f(b)(l)....
“Defendant essentially urges that because plaintiff voluntarily retired, as defined by the RRA, he has no future working capacity. This argument begs the question of whether his employer’s negligence caused his loss of earning capacity which provoked his retirement. Furthermore, it should be noted that voluntary retirement under the RRA does not require a worker to [forgo] all future employment — only that rendered to an employer covered under the RRA. In addition, the Court finds it significant that defendant cites to no reported cases in support of its novel proposition.
Defendant relies solely on an unpublished order from a state court in Kentucky to support its contention. (R. Doc. 61) (citing Fairchild v. CSXT, No. 05-CI06642 (Cir.Ct.Ky.2008)). The order, which is only a few sentences long and lacks substantive analysis, offsets a *453 jury award for future lost wages. Fairchild v. CSXT, No. 05-CI-06642 (Cir.Ct. Ky.2008). It does not preclude the plaintiff from presenting evidence of future wage capacity at trial. Id. Indeed, the Court has found no authority under the FELA that requires such preclusion.
“The Court sees no reason why plaintiffs relinquishment of work with a covered employer should preclude him from arguing under the FELA that, but for the negligence of his employer and his resulting injury, he would have continued to work and receive wages. The factfinder may certainly decide whether or not this is true and, if necessary, to what age plaintiff would have actually worked. Furthermore, defendant can introduce evidence that plaintiff retired and argue that he would have retired at that time regardless of his injury. [CSX] could also argue that [the plaintiffs] failure to return to work violated his duty to mitigate damages. Russell v. Nat’l R.R. Passenger Carp., 189 F.3d 590, 596 (7th Cir.1999) (holding that a FELA plaintiff claiming damages for lost future earnings has a duty to mitigate damages). But, plaintiffs claim for tort-like damages for his employer’s alleged negligence is separate from his right to receive retirement benefits under the RRA. And his receipt of these benefits does not as a matter of law preclude him from recovering future wage loss as an element of his damages under the FELA.”
We find the reasoning of Broadus persuasive, and we similarly hold that Miller’s retirement and his voluntary relinquishment of his right to employment with CSX would not preclude him from seeking as damages under the FELA wages that, but for the alleged negligence of CSX and his resulting injury, he would have continued to earn through his employment with CSX.
In this case Miller presented evidence from which the jury could have concluded that Miller was willing to work after the onset of his neck symptoms and after undergoing surgery and that he would have continued to work for CSX instead of retiring in March 2008 if it had not been for his neck injury. The onset of Miller’s neck symptoms occurred in 2001, and Miller did not miss any time from work while he was receiving conservative treatment for those symptoms. Dr. Raymon subsequently diagnosed Miller with degenerative disk disease with cervical radiculopathy in 2002 and performed surgery in order to decompress the nerve root and fuse the cervical vertebrae. Miller responded well to the surgery and requested that he be released to return to work. Dr. Raymon released Miller in September 2002 to return to his full duties with CSX without restrictions.
Miller again began experiencing symptoms in his neck after he returned to work and was exposed to the work conditions aboard the trains. Miller returned to Dr. Raymon, who prescribed conservative treatment and discussed with Miller the possibility of whether his working conditions could be changed and, if not, whether he could continue to work under the conditions of his job and tolerate the pain. Miller chose at that time to “keep working and tolerate the pain.”
Miller worked and performed the full duties of his job until March 2003. Miller determined at that time that he could no longer tolerate the pain in his neck, and he chose to retire from CSX. Miller testified that he both needed to and intended to work until he reached age 65 but that he was unable to do so because of the pain. Miller continued to receive treatment for his neck pain following his retirement from CSX.
Accordingly, based on the reasoning in Broadus and the evidence presented here, *454 we conclude that the trial court did not err in denying CSX’s preverdict JML as to Miller’s claim for lost wages after March 2003.

III. Mitigation of Damages

A. Alleged Failure to Mitigate

CSX next argues that it established, as a matter of law, that Miller failed to mitigate his damages after his retirement in March 2003 and, therefore, that the trial court erred in allowing him to recover lost wages after that date. A FELA plaintiff claiming lost wages has a duty to reasonably mitigate his damages. See Wilson v. Union Pacific R.R., 56 F.3d 1226 (10th Cir.1995); Broadus, supra; Russell v. National R.R. Passenger Corp., 189 F.3d 590, 596 (7th Cir.1999). The duty to mitigate damages arises after a party has suffered injury, loss, or damage. See Avco Fin. Servs., Inc. v. Ramsey, 631 So.2d 940 (Ala.1994) (noting that a party who has suffered injury, damage, or loss must take reasonable steps to reduce it); Piche v. Nugent, 436 F.Supp.2d 193, 204 (D.Me.2006) (“ ‘A plaintiffs duty to mitigate damages arises after he or she has suffered an injury or loss ....’” (quoting Searles v. Fleetwood Homes of Pennsylvania, Inc., 878 A.2d 509, 521 (Maine 2005))). Once it is established that a FELA plaintiff has a duty to mitigate his or her damages, the FELA defendant has the burden of proving that the plaintiff, with reasonable, effort could have mitigated his or her damages. Jones v. Consolidated Rail Corp., 800 F.2d 590 (6th Cir.1986). Not only must the defendant establish that the plaintiff failed to seek employment, but the defendant must also show that appropriate jobs were available. Wilson, supra. Generally, the question whether an employee acted reasonably to mitigate his or her damages is a question for the jury. Trejo v. Denver & Rio Grande Western R.R., 568 F.2d 181, 184 (10th Cir.1977); Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684 (2d Cir.1998).
Miller’s duty to mitigate his damages arose in July 2002, after Dr. Raymon had diagnosed his neck condition, and performed surgery to correct the condition, causing Miller to first lose time from work. Ramsey, supra; Piche, supra. Miller satisfied his duty to mitigate his damages when he returned to his employment with CSX in September 2002 and worked until he retired in March 2003. However, CSX states that Miller failed to mitigate his damages after March 2003, because, it says, by his own admission he made no effort to find any type of employment after March 2003. CSX relies upon Hansard v. Pepsi-Cola Metropolitan Bottling Co., 865 F.2d 1461, 1468 (5th Cir.1989), in which the United States Court of Appeals for the Fifth Circuit held that an employee was not entitled to backpay because, “by his own admission, he stopped looking for work. A plaintiff may not simply abandon his job search and continue to recover back pay.”
Miller’s duty to mitigate his damages was ongoing. See Howard Johnson Int’l, Inc. v. Inn Dev., Inc., (No. 07-1024-RHB, September 11, 2009) (D.S.D.2009) (not reported in F.Supp.2d). Generally, “the duty [to mitigate damages] persists as long as damages are suffered and may reasonably be mitigated.” Schwartz v. NMS Indus., Inc., 575 F.2d 553, 556 (5th Cir.1978). We note the following testimony as to the issue of mitigation:
“Q [By CSX’s counsel]. Okay. Now, you were the one who made the decision to retire and to not work anymore, right?
“A [By Miller]. Yes, sir. I made that decision based on the pain I was having in my neck.
*455 “Q. Okay. And you’ve made no effort to find alternative employment since you’ve retired, have you?
“A. No, sir.
“Q. Okay. Now, CSX has a vocational rehabilitation program, don’t they?
“A. I have no idea.
“Q. Okay. You’re not aware of a vocational rehabilitation program?
“A. No, sir.
“Q. Did you make any effort to try to find another job within CSX since you retired?
“A. No, sir.
“Q. Okay. Have you made any effort to try to find a job outside CSX?
“A. No, sir.
“Q. You’ve not made any effort to try to find any job since you retired, right?
“A. No, sir.
“Q. And after your retirement, the fact of the matter is, you have no desire to get another job either within the railroad or outside the railroad with some other employer; isn’t that right?
“A. And that’s based on the pain in my neck.
[[Image here]]
“Q. Now, since your retirement you’ve not had any desire to go into any form of employment whether it would hurt your neck or not; isn’t that true?
“A. No, sir, I haven’t.
“Q. Okay.
“A. I haven’t decided what jobs would hurt my neck or which ones wouldn’t. I just — I just hadn’t — I decided I didn’t want to work anymore due to my neck.
“Q. That’s right. And over the last 5 years, since you retired, you’ve made no efforts to try to find another job whether it would hurt your neck or not, you’ve made no effort, right?
“A. No, sir.
“Q. Okay. And the reason for that is you just intend to enjoy your retirement, right?
“A. I think I mentioned that in my deposition.
“Q. You did. Didn’t you tell me—
“A. I also just can’t work due to my neck.”
Although Miller testified that he did not pursue any employment after he retired in March 2003, his testimony, viewed as a whole, creates a question of fact for the jury as to whether Miller could have reasonably mitigated his damages by continuing to work with his neck condition.
Further, as for Miller’s duty to mitigate his damages by seeking other employment at CSX, it was incumbent upon CSX to show that other appropriate jobs were available. Wilson, supra. CSX failed to establish that other appropriate jobs were available for Miller. The record indicates that the only job suggested by CSX that Miller could perform was that of a switch-man. Miller acknowledged that he was the most senior worker in Pensacola at the time of his retirement and that he could have returned to work as a switchman but that did not do so because he did not know “what the effect [of] switching would have on [his] neck.” Additionally, Allerellie testified that Miller’s neck condition made him a safety hazard and unsuitable for the position of switchman.
Accordingly, based on the evidence presented in this case, we cannot say that the trial court erred in not entering a JML for CSX on the issue of mitigation and instead submitting that issue to the jury.

B. Mitigation Instructions

CSX next argues that the trial court’s jury charge on the issue of Miller’s duty to *456 mitígate his damages was erroneous and prejudicial. The trial court gave the following mitigation charge to the jury:
“I’ll tell you that an injured person is under a duty to mitigate or minimize the economic loss resulting from his injuries, depending upon the severity of his injuries and whether or not he is reasonably able to do so, this duty would include the injured person’s making a reasonable effort to resume gainful employment within a reasonable time following his injury.
“If you are reasonably satisfied from the evidence the Plaintiff acted reasonably in this regard, then the Plaintiff has satisfied his duty to mitigate his damages.
“However, if you’re reasonably satisfied from the evidence in this case the Plaintiff has not acted reasonably to mitigate his damages in this regard, then the Plaintiff may not recover damages for earnings lost that otherwise could have been earned.”
CSX argues that based on the facts of this case the trial court’s charge that Miller was under a duty to make a “reasonable effort to resume gainful employment within a reasonable time following his injury ” was improper, incomplete, and misleading. Specifically, CSX states that Miller’s duty to mitigate his damages in this case was twofold and should have been explained as such. First, CSX states that Miller had a duty to mitigate his damages following his surgery and before he returned to work in September 2002. Second, CSX states that Miller had a duty to mitigate his damages during the period after he retired in March 2003, until he reached age 65. CSX argues that the charge given to the jury by the trial court left the jury with the erroneous understanding that Miller needed only to make a reasonable effort to resume gainful employment within a reasonable time following the September 2002 injury and did not make it clear that Miller’s duty to mitigate also extended to the period after his March 2003 retirement.
We disagree with CSX’s contention, because it infers that Miller suffered a second injury, which inference is not supported by the evidence presented. As mentioned above, Miller’s duty to mitigate his damages first arose in July 2002, when he had surgery on his neck causing him to miss time from work. This duty to mitigate was ongoing and continued so long as damages that could reasonably be mitigated were suffered. Schwartz, supra. Miller satisfied the duty to mitigate by returning to his employment with CSX following the surgery. When Miller retired in March 2003, it was not because he had suffered a new injury; rather, according to his testimony, it was because the continuation of his original neck symptoms upon his return to work prevented him from continuing his employment. We have concluded that a question of fact existed as to whether Miller could have reasonably mitigated his damages by continuing to work. Put another way, Miller suffered only one injury that gave rise to a duty to mitigate, which Miller satisfied until March 2003, and a question of fact existed as to whether thereafter Miller could have reasonably mitigated his damages.
Accordingly, we conclude that the trial court’s charge that Miller was under a duty to make a “reasonable effort to resume gainful employment within a reasonable time following his injury ” was consistent with the evidence presented and that it properly informed the jury of the applicable law. Therefore, we find no error as to this issue.

*457
TV. Railroad-Retirement Taxes

CSX next argues that the trial court committed reversible error when it refused to allow CSX to present evidence as to the amount of Miller’s railroad-retirement taxes, thereby allowing him to recover lost wages in an amount in excess of his actual net lost wages. Although the trial court allowed a deduction from Miller’s gross wages for federal and state income taxes, CSX sought to establish that Miller’s gross pay should also be reduced to a net sum reflective of what he would have actually “taken home” after his payment of railroad-retirement taxes. CSX contends that the trial court improperly ruled that “net” wages only meant “gross minus income taxes” and charged the jury that it could award damages for past lost earnings, which it defined as “net lost wages after deduction of federal and state income taxes.” Thus, CSX concludes, Miller was allowed to overstate his wage loss.
CSX primarily relies upon the decisions in Norfolk & Western Ry. v. Liepelt, 444 U.S. 490, 493, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), and Madore v. Ingram Tank Ships, Inc., 732 F.2d 475 (5th. Cir. 1984), to support its contention that the trial court erred in refusing to deduct the railroad-retirement taxes Miller was required to pay from his gross wages in order to determine his net lost wages. It is clear that the appropriate measure of damages in a FELA case is based on the employee’s after-tax income rather than his or her gross income. Liepelt, 444 U.S. at 493, 100 S.Ct. 755. In Liepelt, the Supreme Court stated:
“The amount of money that a wage earner is able to contribute to the support of his family is unquestionably affected by the amount of the tax he must pay to the Federal Government. It is his after-tax income, rather than his gross income before taxes, that provides the only realistic measure of his ability to support his family. It follows inexorably that the wage earner’s income tax is a relevant factor in calculating the monetary loss suffered by his dependents when he dies.”
444 U.S. at 493-94, 100 S.Ct. 755. It is proper to instruct the jury that federal income taxes should be deducted from any damages the jury may award to the plaintiff. Id. Further, in Madore, the United States Court of Appeals for the Fifth Circuit stated:
“Unless the amounts the worker would have been required to pay in income taxes and social security taxes is negligible or should, for some articulated reason, be disregarded, the lost income stream must be computed after deducting the income taxes and social security taxes the worker would have paid had he continued to work, for he is entitled only to be made whole for what he has lost, his net income.”
Madore, 732 F.2d at 479 (footnote omitted).
There is no dispute that both federal and state income taxes are to be deducted from Miller’s gross wages in order to determine his actual net lost wages. The parties dispute, however, whether the railroad-retirement taxes are to be deducted from Miller’s gross wages in order to determine his actual net lost wages.
The railroad-retirement taxes paid pursuant to the RRA have been explained as follows:
“Both employees and carriers pay a federal tax [Railroad Retirement Tax Act, 26 U.S.C. §§ 3201-3233] which funds a Railroad Retirement Account. The Railroad Retirement Board, provided for by the Act, 45 U.S.C. § 231f, disburses benefits from the account to each eligible ‘individual,’ 45 U.S.C. § 231a.
*458 “In its modern form, the Act resembles both a private pension program and a social welfare plan. It provides two tiers of benefits. The upper tier, like a private pension, is tied to earnings and career service. An employee, to be eligible for benefits, must work in the industry 10 years. Absent disability, no benefit is paid, however, until the employee either reaches age 62 or is at least 60 years old and has completed 30 years of service. 45 U.S.C. § 231a(a)(l)....
“The lower, and larger, tier of benefits corresponds exactly to those an employee would expect to receive were he covered by the Social Security Act. 45 U.S.C. § 231b (a)(1)....”
Hisquierdo v. Hisquierdo, 439 U.S. 572, 574-75, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979) (footnote omitted).
“The current version of the RRA was enacted in 1974.... The current version ‘resembles both a private pension program and a social welfare plan.’ Hisquierdo v. Hisquierdo, 439 U.S. 572, 574, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979). It establishes two tiers of benefits: Tier I, which provides amounts essentially equivalent to social security benefits; and Tier II, which provides retirement benefits over and above social security benefits and operates similarly to other industrial pension systems. See Railroad Retirement Board, Railroad Retirement Handbook 2006, at 5, available at www.rrb.gov/pdfiopa/handbook.pdf (hereinafter the ‘Board Handbook’). The Board, ‘an independent agency in the executive branch,’ administers the RRA. 45 U.S.C. § 2311
[[Image here]]
“The RRA Fund is supported in part by a tax on both the railroad companies and the railroad employees. 26 U.S.C. §§ 3201, 3211. Both the railroads and their employees pay taxes into Tier I at a rate equal to social security taxes. See id. For Tier II, the tax rate varies, and is published annually by the Department of the Treasury. See 26 U.S.C. 3241(d). The Tier II annual tax rate for employers is significantly higher than that for employees. E.g., 71 Fed.Reg. 67,709 (Nov. 22, 2006) (an employer is taxed 12.1 percent and an employee is taxed 3.9 percent of the employee’s compensation) .... ”
CSX Transp., Inc. v. Gardner, 874 N.E.2d 357, 361-63 (Ind.Ct.App.2007).
Miller relies on the decision in Maylie v. National R.R. Passenger Corp., 791 F.Supp. 477 (E.D.Pa.1992), and argues that the railroad-retirement taxes were not deductible from his gross wages. We agree. In Maylie, the railroad employee sued his employer under the FELA to recover damages for an injury he suffered to his back during the course of his employment. Following a trial, the jury returned a verdict in favor of the employee and awarded him, among other things, damages for lost wages in the amount of $238,000. In accordance with Liepelt, the employee was awarded damages for loss of income based on a projected after-tax income of 80 percent of the employee’s projected gross income. In determining the amount of income that the employee would have paid in taxes, however, the trial court did not take into account the railroad-retirement taxes. The employer argued on appeal that the trial court erred in failing to include the railroad-retirement taxes in the employee’s projected gross income and that the employee’s gross income should have been reduced by 30 percent, rather than by 20 percent. Maylie, supra.
During the trial the employee’s counsel represented to the court that the value of the benefits package the employee lost *459 after his injury was approximately $18,000 per year, if the value of his eventual retirement pension was taken into account, or $4,700, if the value of the pension was excluded. The employer stipulated to the $4,700 figure for the present value of the employee’s benefits but refused to consider including the amount of the employee’s lost retirement benefits. Based on this refusal, the trial court determined that the $4,700 figure would be used to represent the value of the employee’s benefits and that no deduction would be allowed from the employee’s gross income for the railroad-retirement taxes. Maylie, supra.
Relying upon Liepelt, the employer argued that the trial court erred in refusing to include the amount of the railroad-retirement taxes in the employee’s gross income. The district court addressed the issue as follows:
“Railroad retirement taxes are paid into a fund from which railroad retirement benefits are paid out. See 45 U.S.C. § 231n(a). Had plaintiff continued working until the age of sixty-two, and had plaintiff remained in defendant’s employ during that time, he would have been eligible for an annuity upon his retirement, paid from the fund into which his railroad retirement taxes had been paid. See 45 U.S.C. § 231a(a)(l)(ii). It is undisputed that plaintiff is entitled to recover the value of lost future fringe benefits. Cf. Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 534 & n. 12, 103 S.Ct. 2541, 2549 & n. 12, 76 L.Ed.2d 768 (1984) (lost fringe benefits ‘should be included in an ideal evaluation of the worker’s loss;’ these may include, inter alia, retirement and pension plans). It is likewise clear that the $4,700 figure, which the parties agreed represented the value of plaintiffs benefits package, did not include the contingent value of plaintiffs pension benefits. The value that the jury placed on plaintiffs lost future wages and benefits, therefore, did not include the value of his lost railroad retirement pension. It would be inappropriate to deduct from plaintiffs lost salary taxes that, in effect, represented plaintiff’s contribution toward a pension without including, as an item of damages, the value of that pension. Because defendant did not consent to inclusion of the value of the pension as an item of damages, it was not error to refuse to reduce plaintiffs lost wages by the amounts he would have had to pay in railroad retirement taxes.”
Maylie, 791 F.Supp. at 487-88 (emphasis added).
Here, Miller contends that, but for his neck injury, he would have continued to work for CSX until he reached 65 years of age. Had Miller continued working for CSX until he reached 65, he would have continued to pay the railroad-retirement taxes into the retirement fund, and he would have been entitled to a larger retirement pension at 65 than the pension he received when he retired at age 60. Although Miller was entitled to seek as part of his damages the reduction in the value of his retirement pension, see Jones & Laughlin Steel Corp. v. Pfeifer, 462 U.S. 523, 534, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1984), Miller has not done so in this case. Rather, he has simply sought as damages lost wages from March 2003 through his 65th birth date. Therefore, like the court in Maylie, we conclude that it would be inappropriate to deduct from Miller’s gross lost wages the amount of the railroad-retirement taxes he would have contributed to the retirement fund after March 2003 through his 65th birthday when Miller has not sought as part of his damages claim the reduction in the value of his retirement pension for that same period. To hold otherwise would have the effect of *460 requiring Miller to contribute to a retirement pension, the full value of which he did not receive.
This Court’s determination in this case that the railroad-retirement taxes should not be deducted from Miller’s gross wages to determine his net lost wages is consistent with the holdings of other jurisdictions that have considered this issue. See Ramsey v. Burlington Northern & Santa Fe Ry., 130 S.W.3d 646 (Mo.Ct.App.2004) (rejecting defendant’s reliance on Liepelt and Madore while relying on Maylie and holding that the trial court did not err in refusing to admit evidence of what employee would have had to pay in railroad-retirement taxes when he did not seek lost retirement benefits); Norfolk Southern Ry. v. Perkins, 224 Ga.App. 552, 481 S.E.2d 545 (1997) (holding that the trial court did not err in refusing to allow defendant to show employee’s net income as reduced by the amount of the railroad-retirement taxes); and Norfolk & Western Ry. v. Chittum, 251 Va. 408, 468 S.E.2d 877 (1996) (rejecting defendant’s reliance on Liepelt and holding that the trial court did not err in refusing to deduct the railroad-retirement taxes from employee’s gross wages in order to establish his net lost wages).
Accordingly, we conclude that the trial court did not err in refusing to allow CSX to present evidence as to the amount of Miller’s railroad-retirement taxes for the purposes of deducting those taxes from his gross wages in order to establish his net lost wages.

V. The LIA Claim

CSX next argues that it was entitled to a JML on Miller’s LIA claim. The FELA provides in part:
“Every common carrier by railroad while engaging in commerce between any of the several States or Territories, or between any of the States and Territories, ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its ... machinery ... or other equipment.
[[Image here]]
“In all actions on and after April 22, 1908 brought against any such common carrier by railroad under or by virtue of any of the provisions of this chapter to recover damages for personal injuries to an employee, or where such injuries have resulted in his death, the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee: Provided, That no such employee who may be injured or killed shall be held to have been guilty of contributory negligence in any case where the violation by such common carrier of any statute enacted for the safety of employees contributed to the injury or death of such employee.”
45 U.S.C. §§ 51 & 53. Pursuant to the FELA, a railroad owes its employees a duty to provide a safe workplace. Glass v. Birmingham Southern R.R., 905 So.2d 789 (Ala.2004). This duty is more expansive than the general duty to use reasonable care. Ex parte Williams, 554 So.2d 440 (Ala.1989) (Jones, J., dissenting). In order to recover under a FELA claim alleging negligence, the plaintiff must prove the existence of a duty, a breach of that duty, causation, and damage. Glass, supra; Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d *461 427 (1994). A relaxed standard of causation has been applied under the FELA. “ ‘Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought.’ ” Gottshall, 512 U.S. at 543, 114 S.Ct. 2396 (quoting Rogers v. Missouri Pacific R.R., 352 U.S. 500, 506, 77 S.Ct. 443,1 L.Ed.2d 493 (1957)).
This Court has stated:
“The FELA was enacted in 1908 in order to provide railroad employees a remedy for injuries and death resulting from accidents on interstate railroads. Consolidated Rail Corp. v. Gottshall, 512 U.S. 532, 542, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994). Congress enacted the FELA because of its frustration with rail companies’ evading liability to their employees for such injuries and death; consequently, the FELA strips such an employer of many of its common-law defenses. Rogers v. Missouri Pac. R.R., 352 U.S. 500, 507-08, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). While the FELA is to be construed liberally, it is not a workers’ compensation statute, Gottshall, 512 U.S. at 543, 114 S.Ct. 2396, 129 L.Ed.2d 427, nor does the FELA render an employer an insurer of the safety of its employees. Atlantic Coast Line R.R. v. Dixon, 189 F.2d 525, 526 (5th Cir.1951).
“Despite the liberal manner in which the FELA is to be construed, ‘[t]he basis of the employer’s liability is its negligence, not the mere fact that the injury occurred.’ Dixon, 189 F.2d at 527; see also Louisville & Nashville R.R. v. Green, 255 Ala. 642, 644, 53 So.2d 358, 359 (1951). ‘Employer negligence remains a prerequisite to liability.’ Soto v. Southern Pac. Transp. Co., 644 F.2d 1147, 1148 (5th Cir.1981).”
Glass, 905 So.2d at 793.
The LIA provides that “[a] railroad carrier may use or allow to be used a locomotive or tender on its railroad line only when the locomotive or tender and its parts and appurtenances ... are in proper condition and safe to operate without unnecessary danger of personal injury.” 49 U.S.C. § 20701(1). As mentioned in note 1 above, the LIA does not provide a cause of action to injured railroad employees, rather “[i]t merely makes violation of its prohibitions ‘unlawful.’ ” Urie v. Thompson, 337 U.S. 163, 188, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). The LIA supplements the FELA by imposing on interstate railroads “ ‘an absolute and continuing duty’ to provide safe equipment.” Urie, 337 U.S. at 188, 69 S.Ct. 1018. The LIA imposes a “broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life or limb.... ” McGinn v. Burlington Northern R.R., 102 F.3d 295, 299 (7th Cir.1996) (citing Lilly v. Grand Trunk Western R.R., 317 U.S. 481, 63 S.Ct. 347, 87 L.Ed. 411 (1943)). The LIA “dispense^] ... with the necessity of proving ... negligence ... in certain classes of [FELA] suits.” Urie, 337 U.S. at 189-90, 69 S.Ct. 1018. See also Crane v. Cedar Rapids & Iowa City Ry., 395 U.S. 164, 166, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969). Thus, railroad employers are strictly liable for injuries resulting from violations of the LIA. Lilly, supra; McGinn, supra.
A plaintiff may establish a violation of the LIA by demonstrating: (1) that the railroad employer breached its “broad duty to keep all parts and appurtenances of its locomotives in proper condition and safe to operate without unnecessary peril to life or limb,” or (2) that the *462 railroad employer has failed to comply with regulations issued by the FRA. McGinn, 102 F.3d at 299 (citing Mosco v. Baltimore & Ohio R.R., 817 F.2d 1088, 1091 (4th Cir.1987)). The FELA causation standard is applicable in an action alleging a violation of the LIA. Green v. River Terminal Ry., 763 F.2d 805 (6th Cir.1985). Thus, a plaintiff need establish only that the defendant’s violation of the LIA “ ‘played any part, even the slightest, in producing the injury or death for which damages are sought.’ ” Gottshall, 512 U.S. at 543, 114 S.Ct. 2396 (quoting Rogus, 35 U.S. at 506). Finally, contributory negligence is not a defense to a LIA claim. Garcia v. Burlington Northern R.R., 818 F.2d 713, 715 (10th Cir.1987).
Miller alleged that CSX violated the LIA by using locomotives on its lines the parts and appurtenances of which were not in proper condition and safe to operate without unnecessary danger of personal injury because, he alleged, CSX failed to ensure that the locomotive cab seats were “securely mounted and braced.” We note that a cab seat, which is prescribed by federal regulation, 49 C.F.R. § 229.119(a), is a locomotive part and appurtenance. See Oglesby v. Southern Pacific Transp. Co., 6 F.3d 603 (9th Cir.1993). Further, 49 C.F.R. § 229.119(a) requires that cab seats be “securely mounted and braced.”
CSX initially argues that Miller failed to establish that it violated § 229.119(a) by proving that it failed to provide “securely mounted and braced” cab seats in its locomotives. CSX relies upon the decision in Sandstrom v. Chicago & North Western Transp. Co., 907 F.2d 839 (8th Cir.1990), in which the court affirmed a JML on a LIA claim alleging a violation of § 229.119(a), concluding that the cab seats were not required to be “fixed in place” or “immovable.”
In Sandstrom, the plaintiff was seated in the rear seat of two side-mounted seats of the cab of a locomotive that was pushing a snowplow when the snowplow derailed and jumped the tracks, carrying the locomotive with it. The plaintiff attempted to brace himself by grabbing the seat in front of him but the seat moved forward, causing the plaintiff to suffer serious injuries. Sandstrom, supra.
The plaintiff argued on appeal that the trial court erred in refusing to submit the claim to the jury because, he said, the forward movement of the seat upon the derailment itself was sufficient evidence from which the trial court could have found a violation of § 229.119(a). The United States Court of Appeals for the Eighth Circuit disagreed, stating:
“The mere fact that the seat moved forward upon the derailment would not itself show that the seat was not ‘securely mounted and braced.’ The latter requirement does not mean ‘fixed in place’ or ‘immovable,’ but only that the seat be securely attached and supported. Indeed, the record indicates that the seats were designed to be movable forward and backward because such seat movement was necessary to enable the occupant to position himself to look through the windows of the cab.
“[The plaintiff] introduced no evidence that the seat in front of him was not ‘securely mounted and braced.’ Because of the lack of such evidence, the district court justifiably refused to submit that issue to the jury.”
907 F.2d at 840-41.
Sandstrom is distinguishable from the present case. There, the plaintiffs alleged violation of § 229.1199(a) was based on the fact that the seat moved forward during a derailment. However, the Eighth Circuit Court of Appeals pointed out that the seats were designed to *463 move forward and backward and that the requirement that the seats be “securely mounted and braced” did not require the seats to be “fixed in place” or “immovable.” The court concluded that the plaintiff offered no evidence indicating that the seat by which he was injured was not “securely mounted and braced” beyond the fact that the seat moved forward during the derailment. Although the seats in the present case are side-mounted wall seats designed to move forward and backward like the seats in Sandstrom, Miller’s LIA claim is not based on the forward-and-backward-movement design of the seat. Rather, Miller contends and has presented evidence to the effect that the seats were not “securely mounted and braced” because the track-mounting systems for the seats had eroded, which caused the seats to be “loose” and to “wobble,” “shake,” and “sag.” It would be difficult to comprehend that cab seats that were “loose,” causing them to “wobble,” “shake,” and “sag,” could be said to have been “securely mounted and braced” as required by § 229.119(a). Accordingly, we conclude that Miller has established a violation of § 229.119(a).
We next must determine whether a jury question existed as to whether CSX’s violation of § 229.119(a) “‘played any part, even the slightest, in producing’ ” Miller’s neck injury. Gottshall, 512 U.S. at 548, 114 S.Ct. 2396. Miller presented evidence indicating that he was regularly exposed to side-mounted seats that were loose, unstable, and not secure because of wear to the track-mounting system, which in turn caused the seats to “wobble” and “shake.” The record also indicates that the track-mounting system for the Jagger seats, which were installed in the locomotives in the early 1990s, would also wear, causing those seats to become unstable and to shake.
Miller presented expert testimony from Dr. Kress, a biomechanical engineer, and from Dr. Kelley, an occupational-medicine specialist. Dr. Kress testified that the seats used by CSX were inappropriate for the shock-filled conditions aboard the locomotives and that those conditions were further exacerbated by cab seats that were not securely mounted and braced. Dr. Kelley testified that there is a widely recognized relationship between shock forces and cervical degeneration. He stated that railroad personnel who work aboard trains and who are exposed to vibrating forces are more likely to suffer neck disorders than people not exposed to such forces aboard trains. Dr. Kelley opined that loose locomotive seats increase movement for the employee, which tends to amplify the shock forces aboard the locomotives. Finally, Dr. Kelley concluded that Miller’s work history with CSX and his working conditions aboard the locomotives were significant factors in causing his degenerative disk disease.
Miller began experiencing neck pain in 2001. Initially, Miller’s neck pain would subside at the end of a run when he got off the locomotive and rested. However, the pain would return on his next run when he was again exposed to the seats and to the traumatic forces on the locomotive. The neck pain eventually became constant and pain began radiating down his right arm. An MRI revealed that Miller suffered from degenerative disk disease. Miller initially had a good response to surgery performed by Dr. Raymon to decompress a nerve root and to fuse the cervical vertebrae; however, once Miller returned to work and was exposed to the seats and the traumatic forces aboard the locomotives he again began experiencing symptoms. As stated above, Miller eventually decided to retire from CSX because he could no longer to *464 lerate the neck pain he experienced while aboard the locomotives.
Dr. Raymon testified that repetitive trauma contributes to degenerative disk disease. Dr. Raymon testified that Miller’s working conditions contributed to the degenerative disk disease, stating specifically that Miller’s working conditions aboard the freight trains “aggravated or precipitated his symptoms” and “contributed to his clinical presentation and symptoms.”
Viewing the evidence, as we must, in a light most favorable to Miller, and drawing such inferences as the jury would have been free to draw, Waddell & Reed, supra, we conclude that a jury question existed as to whether CSX’s violation of § 229.119(a) played “ ‘any part, even the slightest’ ” in producing Miller’s neck injury. Gottshall, 512 U.S. at 543, 114 S.Ct. 2396. We therefore conclude that the trial court did not err in denying CSX’s motion for a prever-dict JML.

VI. Foreseeability

CSX next argues that the trial court erred in refusing to instruct the jury on the element of foreseeability. In Louisville & Northern R.R. v. Dollar, 294 Ala. 276, 314 So.2d 867 (1975), the trial court entered a judgment on the jury’s verdict in favor of the plaintiff on his FELA claim. The railroad employer appealed, arguing that the trial court erred in refusing to charge the jury on the element of foreseeability. Like CSX in this case, the railroad employer in Dollar relied on Gallick v. Baltimore & Ohio R.R., 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963), which held that reasonable foreseeability is an “essential element” in a FELA case. Acknowledging that foreseeability is an element of a FELA negligence claim, this Court nevertheless concluded that Gallick did not require a charge on the element of foreseeability because a proper negligence charge encompasses the element of foreseeability. This Court stated:
“The [United States] Supreme Court [in Gallick ] thus properly defined negligence and admeasurement of the duty of the defendant in terms of acts or omissions of the reasonably prudent person under like circumstances. Such definition and admeasurement of duty encompasses the elements of foreseeability without the use of the words ‘anticipate’ or ‘foreseeable.’ This is also true of the following oral charge, given by the trial court in this case:
“ ‘... Well, negligence is simply the failure to use due care under the circumstances. Now, the law says a person is negligent if he does something that a reasonable prudent person would not ordinarily do under the same or similar circumstances, or that a person is negligent if he fails to do that which a reasonable prudent person would do under the same or similar circumstances. So, I would say to you in this case that the gist of this case really is a question of negligence. If there’s no negligence, then, of course, the Plaintiff would have no right to recover....’”
294 Ala. at 280, 314 So.2d at 870.
The trial court charged the jury on negligence as follows in this case:
“Now, I used the term ‘negligence,’ Ladies and Gentlemen, and negligence simply is the failure to use reasonable care. Reasonable care is that degree of care that a reasonably careful person would use under like circumstances. Negligence may consist in doing something that a reasonably careful person would not do under the circumstances or in failing to do something that a reasonably careful person would do under like circumstances.”
*465 The jury charge on negligence in this case is substantially similar to the negligence charge given in Dollar; therefore, it adequately encompasses the element of foreseeability. Accordingly, we conclude that the trial court did not err in refusing to give CSX’s requested charges on foreseeability.

VII. Miscellaneous Jury Charges

CSX next contends that the trial court committed reversible error in several of its other instructions to the jury.
First, CSX argues that the trial court erred in failing to instruct the jury that CSX was not required to furnish its employees with the latest, best, or most perfect equipment available and that it should not be held liable for continuing to use equipment after later improvements had been discovered, provided the plaintiff had a reasonably safe place to work. The trial court substantially gave this charge, stating:
“The extent of the Defendant’s duty was to exercise reasonable care under the circumstances at the time and place in question to provide the Plaintiff a reasonably safe place to work.
“Now, under the law the Defendant had a duty to use reasonable care to provide the Plaintiff with reasonably safe and suitable tools, appliances and machinery with which he was to do his work. Appliances, in order to be reasonably safe and suitable, need not necessarily be the latest or the best which could have been provided to do the work.”
Consequently, we find no error as to this claim.
Next, CSX argues that the trial court erred in failing to instruct the jury that it was not to return a verdict in favor of Miller simply because he had been injured. The trial court instructed the jury as follows:
“[I]n order to recover under [the FELA negligence claim], the plaintiff must prove by a preponderance of the evidence the following: Number 1, that the Defendant was negligent in one or more of the particulars claims. And Number 2, that the Defendant’s negligence proximately caused in whole or in part some injury and consequent damages sustained by the plaintiff.... [I]f you are not satisfied from the evidence or the Plaintiff has not met his burden by a preponderance of the evidence, that the negligence of the Defendant proximately caused in whole or in part some injury and consequent damage to the Plaintiff, then your verdict should be for the Defendant.
[[Image here]]
“The Defendant, however, was not a guarantor or insurer of the safety of the workplace. The extent of the Defendant’s duty was to exercise reasonable care under the circumstances at the time and place in question to provide the Plaintiff a reasonably safe place to work.
[[Image here]]
“If ... the preponderance of the evidence does not support the Plaintiffs claim under the FELA for negligence, then your verdict would be for the Defendant on this claim then you should next consider the Plaintiffs claim under the Locomotive Inspection Act.
[[Image here]]
“If you should find from a preponderance of the evidence that the Defendant did violate the provisions of the Locomotive Inspection Act or [§ 229.119(a) ] as alleged by the Plaintiff, and that the violation was a proximate cause in whole or in part in bringing about or actually causing the Plaintiffs injuries, then the Plaintiff is entitled to recover from the *466 Defendant those damages which you find from a preponderance of the evidence that the Plaintiff actually sustained as a result of that violation without any requirement of a showing of negligence on part of the Defendant.”
The trial court did not err in refusing to give CSX’s requested instruction, because it was clear from the instruction given by the trial court that the jury could not render a verdict in favor of Miller simply because he was injured. The trial court’s instruction to the jury made it very clear that it could not render a verdict in favor of Miller unless he established by a preponderance of the evidence his FELA negligence claim and his FELA absolute-liability claim. Therefore, we find no error as to this claim.
Finally, CSX argues that the trial court erred in giving a portion of Miller’s requested jury instruction no. 10, which is Alabama Pattern Jury Instructions: Civil (“A.P.J.I.”), instruction no. 17.02. Specifically, CSX contends that the trial court erred in instructing the jury regarding the nature of CSX’s duty by electing to include the following sentence in its charge, despite the A.P.J.I. committee’s recommendation not to do so: “This duty is absolute and continuous and cannot be delegated by the defendant to another.” A.P.J.I. 17.02. The Committee’s Notes on Use of this sentence state:
“The Committee does not recommend that the sentence which is in brackets which reads, ‘This duty is absolute and continuous and cannot be delegated by the defendant to another’ be used except in those cases where a contention or suggestion is made that the duty to maintain the tracks or the equipment has been delegated to a third party, such as a siding situation.”
Committee Notes on Use, A.P.J.1.17.02.
Miller argues that CSX opened the door to this charge by continuously arguing throughout the trial that Miller’s trade union was ultimately responsible for the locomotive seats that CSX used and that allegedly caused Miller’s injury. We agree with Miller. CSX informed the jury during its opening statement that members of the union were on the committee that recommended the seats Miller alleged caused his injury. Throughout the course of the trial CSX sought to establish that union members had been involved in selecting the seats placed in the locomotives. Miller objected to this line of questioning based on CSX’s nondelegable duty of care to provide a safe workplace. In response to Miller’s objection, CSX sought an instruction from the trial court directing Miller not to object to the line of questioning based on CSX’s nondelegable duty of care, stating: “[W]e’ll deal with that at the charge conference.” At the charge conference, the trial court overruled CSX’s objection to giving that portion of the charge referring to CSX’s duty as being absolute and nondelegable. Based on the foregoing, we cannot say that the trial court erred in giving that portion of the charge relating to CSX’s duty of care being non-delegable. A party is entitled to have the jury charged on the issues being litigated. See Rivers, supra.

VIII. Conclusion

For the reasons stated above, we affirm the judgment of the trial court.
AFFIRMED.
COBB, C.J., and LYONS, WOODALL, STUART, SMITH, PARKER, and SHAW, JJ., concur.
MURDOCK, J., concurs in the rationale in part and concurs in the result.

. The FELA affords employees of common carriers a cause of action for injuries sustained during the course of their employment that result from their employer's negligence. 45 U.S.C. § 51. The LIA does not confer a cause of action upon injured employees. Rather, "[i]t merely makes violation of its prohibitions ‘unlawful.’ Yet it has been held consistently that the [LIA] supplements the [FELA] by imposing on interstate railroads ‘an absolute and continuing duty’ to provide safe equipment.” Urie v. Thompson, 337 U.S. 163, 188, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949) (footnote omitted). The LIA is "substantively if not in form [an] amendment! ] to the [FELA], [It] dispense[s] ... with the necessity of proving ... negligence” in certain classes of FELA suits. Urie, 337 U.S. at 189-90, 69 S.Ct. 1018. Thus, employers are strictly liable for injuries resulting from violations of the LIA. Lilly v. Grand Trunk Western R.R., 317 U.S. 481, 485, 63 S.Ct. 347, 87 L.Ed. 411 (1943).

. Based on certain language in the United States Supreme Court’s 2003 decision in Ayers, some question has arisen as to whether apportionment between the employer’s negligence and other non-work-related causes is still permissible under the FELA. In Ayers, the employee sued Norfolk & Western Railway seeking to recover damages based on his alleged exposure to asbestos. Norfolk & Western Railway sought an instruction seeking to apportion damages based on the employee’s exposure to asbestos from other sources. The trial court refused to give the instruction, and the Supreme Court affirmed. First, certain statements in the decision appear to extend beyond damages caused by third-party tort-feasors and to prohibit apportionment as to other non-work-related causes. However, we do not read Ayers as prohibiting apportionment as to other non-work-related causes. The issue presented in Ayers was whether apportionment was permissible among third-party tortfeasors. The Supreme Court did not address other non-work-related causes and the opinion must be read in that context. Second, the Supreme Court did not explicitly overrule or reject those cases allowing apportionment among other non-work-related causes.

. Although federal substantive law governs a FELA action, generally a FELA action that is adjudicated in state court is governed by the procedural rules of the state court. Glass v. Birmingham, 905 So.2d 789 (Ala.2004).

. An injured employee can recover lost wages under the FELA. See Seaboard Sys. R.R. v. Keen, 514 So.2d 1018 (Ala.1987); Norfolk Southern Ry. v. Blackmon, 262 Ga.App. 266, 585 S.E.2d 194 (2003).

. Ballast is a type of gravel rock placed between and under railroad ties to provide stability and drainage and to distribute loads. There are two types of ballast: mainline ballast, which is larger, and yard ballast, which is smaller.