NOT DESIGNATED FOR PUBLICATION

No. 112,925

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

CHARLES DAWSON,
*Appellee,*

v.

BNSF RAILWAY COMPANY f/k/a BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY,
*Appellant.*

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL A. DUNCAN, judge. Opinion on remand filed January 21, 2020. Reversed and remanded.

*Marianne M. Auld*, pro hac vice, of Kelly Hart & Hallman LLP, of Fort Worth, Texas, *Kenneth L. Weltz* and *Andrew J. Ricke*, of Lathrop & Gage, LLP, of Overland Park, and *Chad M. Knight*, of Knight Nicastro, LLC, of Kansas City, Missouri, for appellant.

*Steven L. Groves*, of Groves Powers, LLC, of St. Louis, Missouri, *Daniel J. Cohen*, pro hac vice, of Law Offices of Daniel J. Cohen, of St. Louis, Missouri, and *Davy C. Walker*, of Law Offices of Davy C. Walker, of Kansas City, for appellee.

Before MCANANY, P.J., PIERRON and SCHROEDER, JJ.

PER CURIAM: Charles Dawson filed a claim under the Federal Employers' Liability Act (FELA), 45 U.S.C. § 51 (2012) et seq., alleging his employer, BNSF Railway Company f/k/a Burlington Northern and Santa Fe Railway Company (BNSF), was negligent in the design and maintenance of its locomotives and tracks to such a degree it caused his back injuries. A jury returned a verdict in Dawson's favor. This court reversed, holding Dawson's claims were time-barred. Because this court found Dawson's

1

claims untimely, it held BNSF's remaining arguments were moot and declined to address them. Our Supreme Court reversed this court's findings on the timeliness of Dawson's claims and remanded for consideration of BNSF's remaining arguments. Upon reconsideration of BNSF's claims, we find the closing argument by Dawson's counsel was improper because: (1) it contained numerous pleas to the biases, passions, and prejudices of the jury; (2) impermissibly commented on the credibility of witnesses and impugned the integrity of BNSF and its counsel; and (3) misstated the law. As such, we remand for a new trial with counsel instructed not to repeat those errors. With remand, we also find it necessary to address BNSF's other issue involving whether the Locomotive Inspection Act (LIA) and Federal Railway Safety Act (FRSA) preclude Dawson's FELA claims. They do not. Rather, we find both the LIA and FRSA are complimentary to FELA as they govern railroad safety. Based on this determination, we find it unnecessary to address BNSF's other two issues.

Reversed and remanded.

FACTS

Charles Dawson began working for BNSF in 1979. After a few months, he became a brakeman riding in the locomotives. Dawson left BNSF after approximately two years and spent the next six-and-a-half years working at a tire store. Dawson returned to BNSF in the late 1980s and again worked as a brakeman. In 1995, Dawson became a conductor and worked in that role until he had to retire due to his injuries. A detailed factual outline of Dawson's claims and injuries was described by our Supreme Court in its decision, and we see no need to repeat those facts here. See *Dawson v. BNSF Railway Co.*, 309 Kan. 446, 447-50, 437 P.3d 929 (2019).

The case proceeded to trial. At the close of Dawson's case-in-chief, BNSF moved for a directed verdict (now called judgment as a matter of law) pursuant to K.S.A. 2014 Supp. 60-250(a), arguing, in part, Dawson's cumulative injury claim was time barred.

2

BNSF also argued Dawson could not recover for his acute injury claims because they were precluded by the LIA, 49 U.S.C. § 20701 (2012) et seq., and FRSA, 49 U.S.C. § 20101 (2012) et seq., and Dawson had not proven BNSF's negligence. The district court denied this motion.

The jury found: (1) Dawson's cumulative injury claim was timely; (2) BNSF was negligent; and (3) BNSF's negligence caused Dawson's injuries. The jury awarded Dawson $3,110,000 in total damages. BNSF moved for judgment notwithstanding the verdict (now called judgment as a matter of law) pursuant to K.S.A. 2014 Supp. 60-250(b), or a new trial or alteration or amendment of the judgment pursuant to K.S.A. 2014 Supp. 60-259 based on the same arguments presented in its motion for directed verdict, along with some additional arguments not relevant to the issues discussed herein. The district court denied this motion.

BNSF timely appealed to this court, raising five issues. This court previously concluded Dawson's cumulative trauma and acute injury claims were time barred. Because this court found the timeliness of Dawson's claims was dispositive to the case, it did not decide the other issues BNSF raised in its brief. See *Dawson v. BNSF Railway Co.*, No. 112,925, 2016 WL 3031224, at *1, 4-5 (Kan. App. 2016) (unpublished opinion).

Our Supreme Court reversed, finding the record—upon its deep dive, without specific citations to the record by Dawson—sufficient to support a finding Dawson's cumulative injury claim was timely and his acute injury claims were not untimely as a matter of law since they were a continuation of his cumulative injury claim. The matter was remanded to this court to consider the merits of BNSF's remaining issues. See *Dawson*, 309 Kan. at 459-60. On remand, we will now consider BNSF's four remaining claims:

- Dawson's closing argument was sufficiently improper to require reversal for a new trial;

- Dawson's FELA claims for negligent track inspection, negligent maintenance, and defective seat design were precluded by the FRSA and LIA;

- Dawson failed to present sufficient evidence to establish a violation of the LIA; and

- The district court erred in admitting minutes from the Ft. Worth meeting, the Gambrell emails, and Mark Bullock's rebuttal testimony.

This court granted the parties' joint motion to consider the supplemental briefs filed in the Supreme Court and allowed another oral argument on October 24, 2019. Additional facts are set forth as necessary herein.

ANALYSIS

*Dawson's closing arguments were improper.*

BNSF argues it is entitled to a new trial based on Dawson's improper closing arguments. Specifically, BNSF contends Dawson improperly appealed to community values, asked the jury to place itself in Dawson's shoes, and "repeatedly impugned the honesty of both BNSF and its counsel." Dawson argues BNSF waived any claim of error and his argument was not improper. The parties agree this court reviews whether the trial court allowed improper closing argument for an abuse of discretion. See *In re Care & Treatment of Ward*, 35 Kan. App. 2d 356, 379, 131 P.3d 540 (2006). A judicial action constitutes an abuse of discretion if: (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *Biglow v. Eidenberg*, 308 Kan. 873, 893, 424 P.3d 515 (2018). The party asserting the district court abused its

4

discretion bears the burden of showing such abuse of discretion. *Gannon v. State*, 305 Kan. 850, 868, 390 P.3d 461 (2017).

Dawson's counsel and BNSF's counsel were no strangers to each other's trial tactics, having tried many cases against each other. As detailed below, Dawson's closing argument raises many concerns.

After thanking the jury, Dawson's counsel began his closing argument:

"You know, we don't often get a chance to make a real difference, but when you return a verdict as the jury in a civil case, that's your option to do that. And you make a difference not by finding for the plaintiff, not by finding for the defendant—"

BNSF objected, contending Dawson's counsel was "suggesting that this is somehow a civic responsibility to right wrongs in society as a result of this verdict." The district court overruled BNSF's objection. BNSF's only other objection occurred later, when Dawson improperly asked the members of the jury what they would pay not to feel pain from work.

Generally speaking, in a civil case, an objection is necessary to consider a claim of attorney misconduct. See *Smith v. Blakely, Administrator*, 213 Kan. 91, 95-96, 515 P.2d 1062 (1973). BNSF's counsel clearly anticipated Dawson's arguments. However, at the time of the objection, Dawson's counsel had not said anything improper and BNSF only made one other contemporaneous objection, which the district court sustained. Dawson argues BNSF waived any claims of error for the rest of his closing arguments. But in *Smith*, our Supreme Court held:

"We are cognizant of the rule that on appeal reversible error will not be considered when based on misconduct of counsel unless objection is made in trial court. We adhere to this rule; however, we point out that in the above cited cases the instances

5

of impropriety were isolated and not of the nature disclosed by this record. It is apparent in this case that plaintiff's counsel's trial strategy was to try defendant's counsel rather than the issues. His efforts were not of an isolated nature but, to the contrary, permeated the whole of the trial from opening statement to final argument. . . .

"Under what circumstances do remarks of counsel result in reversible error? An uncontradictable answer must be: they are reversible error when, because of them, the parties have not had a fair trial. Factors necessary to a fair trial are an adequate hearing before an impartial tribunal based on legally admissible evidence relevant to the issues involved, free from bias or prejudice. [Citations omitted.]" 213 Kan. at 95-96.

In his closing arguments, Dawson's counsel violated the concept of an appropriate closing argument when he:

- Misstated the law regarding reasonableness;
- Commented on the credibility of witnesses;
- Impugned the honesty of BNSF's counsel;
- Accused BNSF of "buying" science in order to limit its liability;
- Argued the amount of damages awarded would show the conscience of the community; and
- Insinuated one of Dawson's witnesses would be retaliated against.

Collectively, these comments amount to reversible error, despite BNSF's failure to timely object, because they establish multiple acts by Dawson's counsel to deny BNSF a fair jury trial without passion, bias, and prejudice being interjected in the jury trial.

Dawson's counsel also misstated the law regarding reasonableness, arguing for a subjective interpretation by telling the jury:

"And it is appropriate that a jury in this community determine what is reasonable for [an] employer in this community to do. That's why we're not down in Ft. Worth where so many of the railroad witnesses flew up from, not to have a Ft. Worth jury [ ] decide

whether this is an appropriate conduct in Kansas City, Kansas, a cross section of this community decides that, and they do it, each of you, by bringing your values to bear on what's reasonable, what's reasonable conduc[t]."

Dawson argues the comments "merely suggested one's 'values' influence an assessment of what is 'just'" during an "abstract discussion of giving meaning to the concept of 'justice.'" However, the reasonable-person standard is objective; it does not vary based on a community's values. See *Martin v. Naik*, 297 Kan. 241, 245, 300 P.3d 625 (2013); *State v. Ta*, 296 Kan. 230, 240, 290 P.3d 652 (2012). Further, the fundamental rule governing closing arguments is counsel must confine their remarks to matters in evidence. *Glynos v. Jagoda*, 249 Kan. 473, Syl. ¶ 2, 819 P.2d 1202 (1991). No evidence was presented regarding what constituted appropriate or reasonable conduct in Kansas City. Dawson's argument was a fundamental misstatement of the law and was improper. Yet, Dawson's counsel did not stop there with his improper closing.

Dawson's counsel proceeded to improperly comment on the credibility of witnesses. Attorneys cannot express personal opinions on a witness' credibility. See *State v. Pabst*, 268 Kan. 501, 506, 996 P.2d 321 (2000) ("Our rules of conduct clearly and unequivocally say that it is improper for a lawyer to comment on a witness' credibility."). Dawson's counsel attempted to bolster his witness' credibility by naming the specific witness and then telling the jury:

"You know sometimes you can just look at somebody and tell they are credible, because they don't care. They are irritated to be here, they are telling it straight, it's the way it comes out, and they are looking for that door as soon as they are done, but they are telling the truth."

Although this comment is not as aggressive as the other arguments, it is telling of Dawson's counsel's attitude during his closing argument and reflects the line he crossed with his other arguments. Dawson's counsel continued his improper argument when he

went on to indicate one of BNSF's witnesses, Bo Price, was "playing a game" and being dishonest. He said another BNSF witness, Gregory Weames, was "trying to convince [the jury] of a falsehood." These are clear comments on the credibility of the witnesses and further amounted to an improper closing argument.

Dawson's counsel then proceeded to ask the jury:

"[H]ow many people do you have to hurt over the years, how much exposure to liability to injured employees must you have and be facing now and in the future, that it is cheaper instead of paying for the harm you caused to those employees, to say it's cheaper to just buy the science, [it's] cheaper to just change the status of scientific and medical knowledge in this country. May be backward, but it will help us avoid liability in court."

Dawson's counsel ended his initial closing argument by telling the jury how it calculated past and future pain, suffering, and loss of enjoyment of life would "say a lot about the [conscience], the values of this community." Community values are not the governing test as they are not part of the evidence. See *Glynos*, 249 Kan. at 481.

In rebuttal, Dawson's counsel added to his prior improper arguments by insinuating Dawson's witnesses would be retaliated against and again impermissibly commented on the witness' credibility:

"You know the most pathetic thing I saw in this case, I mean other than BNSF's evidence and tactics, was the sad isolated look on Chris Wise's face as he testified. That's the look of openness and honesty coming out of Argentine, facing the people who are going to report back to the LMIT officials what he said. He's got to go back there and live in that world. Don't make his honesty a waste."

Dawson's counsel concluded his rebuttal by telling the jury:  "[BNSF's attorney] says, 'Do you think I have enough influence to get men like Spangler [*sic*] and Dr.

Melhorn to lie?' No, I think your client did. I think to save twenty million dollars a year on claim payouts, yes, your client has the influence to do that."

Collectively, these comments demonstrate Dawson's counsel's closing argument and rebuttal argument consistently ventured into areas intended to inflame the passions of the jury rather than to decide the case on the facts and applicable law. He invited the jury to determine the case based on community standards tied to bias and prejudice. As BNSF points out in its supplemental brief, our Supreme Court found a nearly identical closing argument improper and not one to be repeated on remand in *Bullock v. BNSF Railway Co.*, 306 Kan. 916, 944-46, 399 P.3d 148 (2017). *Bullock* did not, however, decide whether the improper closing argument alone warranted a new trial. See 306 Kan. at 946.

"[R]eversal of a civil jury verdict is appropriate when 'there is a reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *Bullock*, 306 Kan. at 943 (quoting *Siruta v. Siruta*, 301 Kan. 757, 772-73, 348 P.3d 549 [2015]). "[R]emarks of counsel result in reversible error . . . when, because of them, the parties have not had a fair trial." *Smith*, 213 Kan. at 96. *Smith* found reversible error where "the remarks and conduct of counsel materially distracted and hindered the jury from returning an impartial verdict based upon the issues between the parties and the evidence presented relevant to [those] issues." 213 Kan. at 96. There, Smith's counsel's closing argument attacked the actions of opposing counsel, commented on the credibility of witnesses, and generally invited the jury to render its decision based on passion or prejudice. See 213 Kan. at 95. *Smith* found "[i]t [was] apparent . . . [Smith's] counsel's trial strategy was to try defendant's counsel rather than the issues." 213 Kan. at 96.

Here, Dawson's counsel's closing arguments attacked BNSF's counsel and generally impugned BNSF's counsel's credibility. Dawson's counsel further impermissibly commented on the credibility of BNSF's witnesses and attempted to bolster the credibility of his own witnesses. Particularly troubling is Dawson's counsel's

insinuation that BNSF had the influence to get expert witnesses to lie or offer unreliable evidence "to save twenty million dollars a year on claim payouts." This is an attack on the general honesty and integrity of BNSF and the credibility of its witnesses. This comment is unsupported by the evidence and is extremely prejudicial because it suggests BNSF is faced with numerous similar claims each year. Thus, it invites the jury to render its decision or draw inferences against BNSF based on unrelated matters not in the evidence.

Dawson's counsel's arguments strayed from the facts and law and invited the jury to render its decision based on its subjective values and beliefs, i.e., an impermissible appeal to the biases, passions, and prejudices of the jury. See *Bullock*, 306 Kan. at 946. Dawson's counsel's remarks were erroneous and denied BNSF a fair trial. See *Smith*, 213 Kan. at 94-96. This amounts to reversible error in light of the record as a whole because:

> "A plaintiff seeking recovery under FELA must 'prove the *traditional common-law negligence* elements of duty, breach of a duty, foreseeability of injury, *and causation* with its attendant relaxed burden.' *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 491, 369 P.3d 966 (2016); see also *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 691-92, 131 S. Ct. 2630, 180 L. Ed. 2d 637 (2011) (comparing tort litigation causation with relaxed causation standard under FELA)." (Emphasis added.) *Bullock*, 306 Kan. at 932.

Here, Dawson's evidence on causation was largely based on Dr. Glenn Amundson's testimony. However, Dr. Amundson's opinion as to the cause of Dawson's injuries was offered in response to a lengthy and flawed hypothetical. Dr. Amundson did not explore other potential causes of Dawson's injury, and Dawson failed to fully and accurately disclose his extensive medical history to Dr. Amundson. Dawson also presented some potential causation evidence from his chiropractor, Dr. Cherie Wickham. However, Dr. Wickham stated she could only conclude with reasonable certainty that Dawson's employment contributed to his injuries. The evidence at trial showed a number of possible causes of Dawson's condition, including his:

10

- Age;

- Consumption of alcohol;

- Past history of smoking;

- Prior back injuries outside his employment at BNSF;

- Participation in drag racing and riding motorcycles; and

- Potential genetic causes.

Even under FELA's relaxed causation standard, it is highly questionable whether a reasonable fact-finder would have concluded Dawson's evidence sufficiently established causation—an essential element of his claim. See *Bullock*, 306 Kan. at 932.

There is a reasonable probability the error affected the outcome of the trial in light of the entire record; thus, it is reversible. See *Bullock*, 306 Kan. at 943. We reverse and remand for a new trial due to Dawson's counsel's improper closing remarks despite BNSF's failure to object to each improper argument. See *Bullock*, 306 Kan. at 944-46; *Smith*, 213 Kan. at 94-96. With our order to remand, the admonition by our Supreme Court in *Bullock* is repeated. Dawson's counsel is prohibited from making the same arguments before the new jury. Given our decision to remand, we decline to address the merits of BNSF's arguments in Issues III and V of its brief, as doing so would constitute an improper advisory opinion. However, we will address the merits of Issue II of BNSF's brief because it may be helpful to the parties and the district court.

*Dawson's FELA claims involving defective seat design and negligent track inspection and maintenance are not precluded by the LIA and FRSA.*

BNSF argues two federal statutes, the LIA, 49 U.S.C. § 20701 et seq., and the FRSA, 49 U.S.C. § 20101 et seq., preclude Dawson's FELA claims. Whether the LIA and FRSA preclude Dawson's FELA claims turns on statutory interpretation, which is a question of law subject to unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015).

BNSF makes two arguments regarding the LIA. First, Dawson's defective seat design claim—to the extent he raises it under the FELA—is precluded by the LIA. Second, Dawson failed to prove any of the seats he rode on did not comply with applicable LIA regulations. BNSF's second argument regarding the LIA may be at least partially dispositive to Dawson's defective seat design claim; therefore, we address BNSF's LIA arguments in reverse order. BNSF further contends the FRSA precludes Dawson's FELA claim for negligent track inspection and maintenance because Dawson did not establish BNSF violated any federal regulations.

*Failure to produce evidence of specific noncomplying seats*

BNSF argues "Dawson presented *no evidence* that BNSF violated the LIA's regulation applicable to the locomotive equipment in question—i.e., locomotive seats. Dawson's evidence of alternative seat designs that BNSF might have implemented—but that federal regulations do not require—is legally incompetent to prove an LIA violation." BNSF asserts "Dawson . . . cannot prevail on his allegation that BNSF's seats violate the LIA because he offered no evidence that any seat he rode upon during his career actually violated the regulation." When a verdict is challenged for insufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, the verdict will not be disturbed on appeal. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011).

BNSF argues Dawson's ergonomics expert, Dr. Tyler Kress, "did not inspect any of the seats upon which Dawson claimed to be injured or the maintenance records related to those seats," and "neither Dawson nor the coworkers that he was with during his three alleged rough riding incidents made any claims regarding the seats on those rides, and BNSF's maintenance records established there was no problem with those seats." BNSF also asserts "the seat features about which Dawson complains are not 'an integral or

essential part' of a locomotive that would give rise to LIA liability in the absence of a regulatory violation," quoting in part *King v. Southern Pacific Transp. Co.*, 855 F.2d 1485, 1490 (10th Cir. 1988).

In support of its argument, BNSF cites *Thomas v. Union Pac. R. Co.*, 2010 WL 143756, at *1, 3 (E.D. Ark. 2010) (unpublished opinion), in which the federal district court stated: "The Court is not aware of any case in which an LIA claim succeeded where the Plaintiff identified neither the specific train or trains that were allegedly defective or unsafe, nor the specific defect or unsafe condition (icing, a too-loud horn, etc.)." The federal district court granted Union Pacific's partial motion for summary judgment and did not allow Thomas to proceed to trial with his LIA claim. *Thomas*, 2010 WL 143756, at *3.

Dawson argues *Thomas* is distinguishable because Thomas alleged his injuries were "due to rough riding engines" but "the evidence proved he actually did not ride on the rough riding engines." To some extent, Dawson is correct, although he does not fully explain the point or pin cite to *Thomas*. Nevertheless, *Thomas* is distinguishable because there was evidence showing engineering defects with certain trains between 1998 and 2000; however, Thomas was not hired by Union Pacific until 2002. See 2010 WL 143756, at *2-3. Moreover, Thomas' allegations were not limited "to any certain train or trains, but include[d] the gambit of trains on which he worked from the time [Union Pacific] hired him in 2002." *Thomas*, 2010 WL 143756, at *3.

Dawson argues he alleged a specific unsafe condition—loose and wobbly seats in violation of 49 C.F.R. § 229.119(a) (2018). He supports his argument by citing *CSX Transp., Inc. v. Miller*, 46 So. 3d 434, 463 (Ala. 2010). There, Miller asserted CSX's seats were not securely mounted and braced as required by 49 C.F.R. § 229.119(a). Miller claimed the track-mounting systems for the seats had eroded, causing them "to be 'loose,' and to 'wobble,' shake,' and 'sag.'" 46 So. 3d at 463. The *Miller* court held: "It would be

difficult to comprehend that cab seats that were 'loose,' causing them to 'wobble,' 'shake,' and 'sag,' could be said to have been 'securely mounted and braced' as required by § 229.119(a). Accordingly, we conclude that Miller has established a violation of § 229.119(a)." 46 So. 3d at 463.

Here, Dawson and a fellow BNSF employee, Mark Shumate, testified they rode on locomotives with loose or wobbly seats. Shumate indicated he often rode on locomotive units with "[t]oadstool seats," which were prone to wobbliness and rocking; some worse than others. Shumate indicated this was due to "the design of the seat . . . in order for it to slide, it has to [have] a certain amount of slack." Shumate did not specifically assert the seats were improperly mounted or braced. However, he indicated the looseness or play in the seats added "a little bit" to the jarring he experienced.

Dawson also testified he rode on toadstool seats, which did not support his body and resulted in awkward postures, jarring, and vibration. Dawson was asked:  "Were the seats frequently not maintained so they were loose and wobbly?" He responded:  "Yes." On cross-examination, Dawson was asked if he was claiming that sitting on the locomotive seats was unsafe. He responded:  "It wasn't necessarily unsafe. The seats were not properly maintained." But BNSF failed to clarify which seats or locomotives Dawson was referring to, why he believed the seats were improperly maintained, or when he believed this occurred. Dawson later admitted he did not recall any problems with the seats in the locomotives he rode on March 21, 2008, March 22, 2008, or January 29, 2009. Rather, he believed the problem resulted from a combination of the condition of the tracks and the suspension or shocks of the locomotives.

Dawson's ergonomics expert, Dr. Tyler Kress, testified there was "certainly evidence that there's consistent problems with seats such as broken arm rests, missing arm rests, maintenance issues where there's—if they are loose and wobbly seat back problems, lots of problems with the adjustability and controls." Dr. Kress based this

14

assertion on his experiences in interviewing "a lot of crewmen from BNSF from doctors and engineers and Mr. Dawson." However, Dr. Kress had not inspected any of the seats in the specific locomotives Dawson rode on the specific dates Dawson identified. Dr. Kress had inspected the maintenance records on those locomotives but "[did not] remember anything specifically." Dr. Kress confirmed he had seen and heard of problems with the maintenance of seats in other locomotives, but he could not recall any specific problems with the three locomotives related to Dawson's acute injury claims.

Here, the jury's verdict reflects it accepted Dawson's *cumulative injury* claim. The jury found BNSF failed to comply with the LIA or Federal Railroad Administration (FRA) regulations regarding locomotives and such noncompliance caused or contributed to Dawson's injuries. The jury's finding as to BNSF's noncompliance with the LIA or FRA regulations was a general finding and was not specific to any particular date.

BNSF's argument largely focuses on Dawson's acute injury claims resulting from the March 21, 2008, March 22, 2008, and January 29, 2009 incidents. Its argument appears correct with regard to Dawson's acute injury claims. Dawson did not present evidence showing the seats he rode on during those specific incidents were improperly mounted, maintained, or braced.

However, BNSF does not properly address whether Dawson established a cumulative injury claim under the LIA or FRA regulation. At best, it incidentally raises the point, stating:  "Dawson . . . offered no evidence that any seat he rode upon during his career actually violated the regulation." Nevertheless, viewed in the light most favorable to Dawson, the evidence sufficiently established a cumulative injury claim under the LIA.

The jury was instructed it could find a LIA violation if BNSF failed to securely mount and brace the locomotive seats in violation of 49 C.F.R. § 229.119(a). Dawson and

15

Dr. Kress both testified improper maintenance resulted in loose and wobbly seats at various times. Dawson's claim appears similar to *Miller* because:

> "Miller presented evidence indicating that he was regularly exposed to side-mounted seats that were loose, unstable, and not secure because of wear to the track-mounting system, which in turn caused the seats to 'wobble' and 'shake.' The record also indicates that the track-mounting system for the Jagger seats, which were installed in the locomotives in the early 1990s, would also wear, causing those seats to become unstable and to shake." 46 So. 3d at 463.

Here, Dawson identified a particular type of seat—toadstool seats—he rode on and claimed they were loose and wobbly. Shumate's testimony indicated the design of the seats caused them to wobble and shake. Dr. Kress specifically identified the model number of one seat Dawson rode on and identified other seats as Jagger and Balter seats. Dawson and Dr. Kress testified there were problems with the seats due to improper maintenance but did not elaborate as to nature of the maintenance issues.

Dr. Kress did, however, testify the lack of vibration dampening in pole-mounted seats can cause them to become loose and wobbly over time, which "is not a good rigid attachment." Dr. Kress indicated the seats can loosen over time to the point they are no longer securely attached. Dr. Kress further cited a scientific study indicating engine vibrations in locomotives can cause seats fastened to the locomotive's walls or frame to become worn and loosen when the locomotive is in motion. Dr. Kress indicated BNSF only used wall and floor mounts for the seats in its locomotives. Shumate indicated the toadstool seats were mounted to the floor by a pipe within another pipe with a pin for adjusting the seat. In other words, they were pole-mounted seats.

49 C.F.R. § 229.119(a) requires seats to be properly mounted and braced. Shumate's testimony that the design of the toadstool seats caused them to wobble and shake suggests they may have been improperly braced, even if they were properly

mounted. Dawson's and Dr. Kress' testimony suggests the seats were not properly mounted or braced due to improper maintenance. Collectively, Shumate's and Dr. Kress' testimony suggests the design of the seats caused them to become improperly secured with use over time. And Dawson's and Shumate's testimony suggests the toadstool seats in BNSF's locomotives remained unchanged for a significant period of time.

BNSF's assertion "[i]n the absence of evidence identifying specific defective seats on specific BNSF locomotives, Dawson cannot maintain his LIA claim as a matter of law" is unavailing. Its reliance on *Thomas*, 2010 WL 143756, at *3, is misplaced. Dawson did not identify the specific locomotives he rode on; however, it is undisputed toadstool seats were used in BNSF's locomotives during the course of Dawson's employment and he frequently rode on them. Dawson persuasively cites to *Synar v. Union Pacific Railway Co.*, 2001 WL 1263573, at *1, 19 (Tex. App. 2001) (unpublished opinion), which involved the Federal Safety Appliance Act (FSAA), 49 U.S.C. § 20301 (2012) et seq., for the proposition that requiring a plaintiff to prove specific defective parts which contributed to the plaintiff's injury would make recovery impossible in a cumulative trauma case.

*Synar* provides a persuasive analogy because like *Miller*, Dawson's cumulative injury claim turns on repeated exposure to a specific type of seat used in several different locomotives, not one specific seat in a single locomotive. The *Miller* court noted the seats at issue there—Jagger seats—had been in use for several years before Miller first experienced his symptoms. See *Miller*, 46 So. 3d at 463-64. Here, BNSF was using toadstool seats when Dawson began working as a conductor in 1995. He used toadstool seats throughout his time as a conductor and had ridden on them as recently as 2009 or 2010. The jury found Dawson was not aware his cumulative trauma injury was related to his work activities prior to February 22, 2008. Thus, the evidence shows Dawson was exposed to potentially noncompliant seats for approximately 13 years before he had reason to know they may have caused his injuries. Similar to the reasoning in *Synar*, it

would be unreasonable to expect Dawson to specifically identify each of the various locomotives he rode on so frequently over the lengthy time span of his career; it would make recovery nearly impossible. See *Synar*, 2001 WL 1263573, at *19.

Next, Dawson argues the evidence also supports a finding BNSF violated the LIA by failing to properly maintain the shocks on its locomotives. BNSF fails to address this point in its brief. But Dawson's argument fails because it rests, to some extent, on unfounded speculation. At best, it requires considerable inference stacking, which is impermissible. See *Bradshaw v. Smith*, No. 113,922, 2016 WL 4413956, at *1, 4 (Kan. App. 2016) (unpublished opinion).

The district court instructed the jury it could find a LIA violation if the shock absorbers on BNSF's locomotives were broken in violation of 49 C.F.R. § 229.65 (2018). Dawson asserted some of the locomotives he rode on repeatedly bottomed out at railroad crossings. He believed this may have been due to a combination of the condition of the tracks and the suspension or shocks of the locomotives. Steven Mallon, a BNSF engineer, testified he also experienced bottoming out in similar locomotives.

A BNSF machinist, Chris Wise, testified about the regular inspections of BNSF's locomotives. Wise indicated six to nine locomotives usually passed through his facility—the Argentine Yard LMIT—for inspection every day, the majority of which were made by General Electric (GE). Wise was responsible for inspecting the shocks and suspension on the locomotives. While federal regulations require defective shocks to be replaced, Wise admitted BNSF did not always do so. Wise testified defective shocks were considered a fairly low priority and BNSF often did not have enough replacement shocks in stock for its GE locomotives. Replacement GE shocks would generally be used within a day of their arrival. Then, until more arrived, GE locomotives would often be sent back into service without replacing the shocks.

Dawson testified the locomotives he rode on March 21, 2008, March 22, 2008, and January 29, 2009, were all GE locomotives like Wise described. Dawson argues: "Given the testimony of Wise, there was sufficient evidence for the jury to find BNSF violated FRA regulations regarding shocks." Dawson's argument fails because he does not explain how the evidence showed the particular locomotives Dawson was riding on had been inspected at Wise's facility—the Argentine Yard—and the record does not establish they had been inspected there. The record further shows BNSF had other inspection facilities for its locomotives, and Dawson does not allege the same maintenance issues occurred in those facilities.

Dawson's alternative LIA argument based on the locomotives' shocks fails. However, Dawson presented sufficient evidence to establish a violation of LIA regulations based on improperly secured seats; thus, BNSF's argument ultimately fails. We reach the merits of this issue only because of the possibility it could affect the scope of the issues on remand. Our analysis is specific to the evidence in the record before us and our appellate standard of review. The jury's verdict was not based on any particular LIA section or FRA regulation. Here, viewed in the light most favorable to Dawson, sufficient evidence supports a finding BNSF violated 49 C.F.R. § 229.119(a). Thus, BNSF violated a regulation under the LIA. We do not reweigh the evidence underlying the jury's verdict even if a reasonable jury might have reached a different conclusion. In short, we only hold there is no procedural bar to this issue being relitigated on remand; neither party is entitled to judgment based on our analysis. Different evidence may be presented in a new trial, and the jury's verdict must turn on *that* evidence.

*Dawson's FELA claims are not precluded by the LIA and FRSA.*

BNSF argues Dawson's seat design defect claim is precluded by the LIA and his track maintenance claims are precluded by the FRSA. We address BNSF's FRSA preclusion argument first. The same general analysis applies to BNSF's LIA preclusion

19

argument. But BNSF's argument on that point is only relevant to Dawson's complaints about ergonomic defects in BNSF's seats.

Dawson argues the authorities cited by BNSF are called into question by the United States Supreme Court's decision in *POM Wonderful LLC v. Coca-Cola Co.*, 573 U.S. 102, 134 S. Ct. 2228, 189 L. Ed. 2d 141 (2014). The Sixth Circuit Court of Appeals briefly described the interplay between the FELA and the FRSA in *Nickels v. Grand Trunk Western R.R., Inc.*, 560 F.3d 426, 429 (6th Cir. 2009):

> "The FELA makes a railroad liable to its employees injured 'by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.' 45 U.S.C. § 51. The statute provides a 'cause of action sounding in negligence [.] . . . Absent express language to the contrary, the elements of a FELA claim are determined by reference to the common law.' *Norfolk S. Ry. Co. v. Sorrell*, 549 U.S. 158, 165-66, 127 S. Ct. 799, 166 L. Ed. 2d 638 (2007).
>
> "The FRSA's purpose is 'to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.' *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 347, 120 S. Ct. 1467, 146 L. Ed. 2d 374 (2000) (quoting 49 U.S.C. § 20101 [1994]). The FRSA authorizes the Secretary of Transportation ('Secretary') to 'prescribe regulations and issue orders for every area of railroad safety.' *Id.* (quoting 49 U.S.C. § 20103(a) ). Under the FRSA's express preemption provision, '[l]aws, regulations, and orders related to railroad safety . . . shall be nationally uniform to the extent practicable.' 49 U.S.C. § 20106(a)(1). 'A State may adopt or continue in force a law, regulation, or order related to railroad safety . . . until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement.' 49 U.S.C. § 20106(a)(2). A state-law negligence action is 'covered' and therefore preempted if a FRSA regulation 'substantially subsume[s]' the subject matter of the suit. *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664, 113 S. Ct. 1732, 123 L. Ed. 2d 387 (1993). This provision explicitly preempts only State laws, regulations, and orders; it does not mention other federal safety standards."

The Sixth Circuit concluded a plaintiff's "claims are precluded by the FRSA if they would have been preempted if brought by a non-employee under state law." 560

F.3d at 430. The Sixth Circuit relied on two prior decisions: *Lane v. R.A. Sims, Jr., Inc.*, 241 F.3d 439 (5th Cir. 2001), and *Waymire v. Norfolk and Western Ry. Co.*, 218 F.3d 773 (7th Cir. 2000). BNSF relies primarily on these three cases to support its argument.

In *POM Wonderful*, the United States Supreme Court examined whether one federal statute—the Federal Food, Drug, and Cosmetic Act (FDCA), 21 U.S.C. § 301 et seq. (2012)—precluded a claim based on another federal statute—the Lanham Act, 15 U.S.C. § 1051 et seq. (2012). POM filed a Lanham Act claim alleging the label on one of Coca-Cola's juice lines was deceptive and misleading. The district court granted Coca-Cola partial summary judgment, ruling the FDCA and its regulations precluded claims based on the label. The Ninth Circuit affirmed, ruling POM's claim was precluded by the FDCA, which granted the United States near-exclusive enforcement authority for claims of false or misleading labeling. The United States Supreme Court examined the Lanham Act and FDCA and noted neither statute expressly forbade Lanham Act challenges to labels regulated by the FDCA. It further noted the statutes' silence was significant since they had coexisted since 1946, holding:

> "When two statutes complement each other, it would show disregard for the congressional design to hold that Congress nonetheless intended one federal statute to preclude the operation of the other. See *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001) ('[W]e can plainly regard each statute as effective because of its different requirements and protections'); see also *Wyeth*, 555 U.S. at 578-579. The Lanham Act and the FDCA complement each other in major respects, for each has its own scope and purpose. Although both statutes touch on food and beverage labeling, the Lanham Act protects commercial interests against unfair competition, while the FDCA protects public health and safety. Compare *Lexmark,* 572 U.S. at 131-132, with *62 Cases of Jam,* 340 U.S. 596. The two statutes impose 'different requirements and protections.' *J.E.M. Ag Supply, supra,* at 144." *POM Wonderful*, 573 U.S. at 115.

Like the Lanham Act and the FDCA, the FELA and the FRSA are complementary. Both address railroad safety, but each has its own purpose and scope. The FELA protects

railroad employees by imposing liability for the railroad's negligence. The FRSA is intended to promote safety and reduce railroad accidents. We find no language in either statute to specifically preclude the other.

Like BNSF, Coca-Cola made an express preemption argument based on nationally uniform requirements. The United States Supreme Court addressed this argument:

> "Although the application of a federal statute such as the Lanham Act by judges and juries in courts throughout the country may give rise to some variation in outcome, this is the means Congress chose to enforce a national policy to ensure fair competition. It is quite different from the disuniformity that would arise from the multitude of state laws, state regulations, state administrative agency rulings, and state-court decisions that are partially forbidden by the FDCA's preemption provision. Congress not infrequently permits a certain amount of variability by authorizing a federal cause of action even in areas of law where national uniformity is important." *POM Wonderful*, 573 U.S. at 117.

*POM Wonderful* directly addresses BNSF's argument, albeit in the context of two unrelated statutes. Prior to *POM Wonderful*, there was significant disagreement as to the interplay between the FRSA and FELA. See generally *Cowden v. BNSF Ry. Co.*, 690 F.3d 884, 889-92 (8th Cir. 2012) (citing cases finding FRSA preclusion of FELA claims as well as cases finding the FRSA does not preclude FELA claims). However, as Dawson points out, several courts have subsequently applied the reasoning in *POM Wonderful* and concluded the FRSA does not preclude FELA claims. See *Fair v. BNSF Ry. Co.*, 238 Cal. App. 4th 269, 286, 189 Cal. Rptr. 3d 150 (2015); *Henderson v. Nat'l R.R. Passenger Corp.*, 87 F. Supp. 3d 610, 619-21 (S.D.N.Y. 2015); *Bratton v. Kansas City Southern Ry. Co.*, 2015 WL 789127, at *1, 2 (W.D. La. 2015) (unpublished opinion); *Hanaburgh v. Metro-North Commuter R.R.*, 2015 WL 1267145, at *1, 3-4 (S.D.N.Y. 2015) (unpublished opinion). The cases Dawson cites are persuasive and well-reasoned and appear to correctly apply the Supreme Court's decision in *POM Wonderful* to the statutes at issue here. We agree and find the FRSA does not preclude Dawson's FELA claim.

*POM Wonderful*'s reasoning also applies to BNSF's argument regarding preclusion by the LIA. The FELA allows recovery in a broad range of situations, while liability under the LIA is narrower. See *King v. Southern Pacific Transp. Co.*, 855 F.2d 1485, 1488 n.1 (10th Cir. 1988). Under the FELA, railroads

> "shall be liable . . . to any person suffering injury while he is employed by such carrier . . . for such injury . . . resulting in whole or in part from the negligence . . . of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, . . . or other equipment." 45 U.S.C. § 51.

The FELA imposes liability on railroads for injuries to their employees attributable in whole or in part to the railroad's negligence. *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 507, 77 S. Ct. 443, 1 L. Ed. 2d 493 (1957). The LIA complements the FELA by giving the Secretary of Transportation the authority to inspect locomotives, regulate their design and maintenance, and order railroads to keep reports and make repairs when an inspection reveals a defect. See 49 U.S.C. § 20702. Violations of the LIA establish per se negligence under the FELA. See *Coffey v. Northeast Ill. Regional Commuter R. Corp.*, 479 F.3d 472, 477 (7th Cir. 2007). However, the LIA is specific to the regulatory authority of the Secretary of Transportation over railroads. It does not, in and of itself, provide for a cause of action by railroad employees against their employers. See 49 U.S.C. §§ 20701-20703. Rather, the FELA allows railroad employees to bring a claim against railroads for injuries resulting from "defect[s] or insufficienc[ies], due to [the railroad's] negligence, in its cars, engines, appliances, machinery, . . . or other equipment." 45 U.S.C. § 51.

The FELA is broader than the LIA because the FELA allows for claims related to defects *or* insufficiencies in the railroad's equipment, whereas the LIA only pertains to defects. Compare 45 U.S.C. § 51 with 49 U.S.C. §§ 20702-20703. Here, Dawson's complaint about ergonomic issues with BNSF's seats is a claim generally alleging

insufficiency of BNSF's cars, engines, machinery, and/or other equipment. Thus, it is appropriately within the scope of the FELA. See 45 U.S.C. § 51; *Rogers*, 352 U.S. at 507.

On remand, we agree Dawson can pursue his FELA claims based on negligent track inspection and maintenance and defective maintenance or design of BNSF's seats. His claims are not precluded by the FRSA or LIA. However, Dawson's allegations relating to ergonomic design flaws in BNSF's seats are permissible under the FELA but do not establish a violation of the LIA as a matter of law.

Reversed and remanded.